UNITED STATES of America,
Plaintiff–Appellee,

v.

Durojaiye Sobanke PETERS, also known as Fred Hauswirth, also known as Durojaiye Shawn Peters, also known as Sobanke Durojaiye Peters, also known as Samuel Roberts Stephens, also known as Godwin A. Peters,

and

Godwin O. Ayinde, also known as Terry J. Denmark, also known as Harold Lazler, also known as Quintin Duran, also known as Victor Olukayode Peters, Defendants–Appellants.

Nos. 92–2273, 92–2274.

United States Court of Appeals,
Tenth Circuit.

Dec. 1, 1993.

Susan L. Foreman, Asst. Federal Public Defender, Denver, CO (Michael G. Katz, Federal Public Defender, Denver, CO, with her on the briefs for defendant-appellant Durojaiye Sobanke Peters; Peter Schoenburg, Asst. Federal Public Defender, Albuquerque, NM, on the briefs for defendant-appellant Godwin O. Ayinder), for defendants-appellants.

Presiliano Torrez, Asst. U.S. Atty. (Larry Gomez, U.S. Atty., and Tara C. Neda, Asst. U.S. Atty., on the brief), Albuquerque, NM, for plaintiff-appellee.

Before McKAY, Chief Judge, ENGEL,* and BALDOCK, Circuit Judges.

McKAY, Chief Judge.

After the district court denied their joint pretrial motion to suppress incriminating statements and false identification documents, Mr. Ayinde and Mr. Peters pled guilty to unlawful possession of identification documents and false representation of citizenship in violation of 18 U.S.C. § 1028(a)(3) and § 911. Defendants reserved their right

* Honorable Albert J. Engel, Senior Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

to appeal the denial of their suppression motion pursuant to Federal Rule of Criminal Procedure 11(a)(2). Defendants now appeal, alleging that, in conducting the investigation which led to the confiscation of certain illegal identification documents, government officials made a pretextual stop of their vehicle, made a roving border patrol stop without reasonable suspicion, and exceeded statutory authority by executing a border stop not within "a reasonable distance from any external boundary of the United States." 8 U.S.C. § 1357(a)(3). Defendants further contend that the government failed to prove that Mr. Peter's consent to search the truck was freely and voluntarily given.

While on morning patrol duty, Officer Martin of the Flagstaff, Arizona Police Department noticed a rented Ryder truck driving a few vehicles in front of his patrol car. As he followed the truck through a wide turn onto a highway, Officer Martin noticed the truck weave a few feet into the left lane, and then quickly return to the right lane. Approximately one-half mile from the place where he first saw it weave, the truck strayed over the center line once again and Officer Martin promptly pulled the vehicle over.

Officer Martin, who was in uniform and carrying a gun, approached the driver, Mr. Peters, and advised him that he had been stopped for weaving. He obtained a driver's license from both Mr. Peters and the passenger, whom he later identified as Mr. Ayinde. Mr. Peters' driver's license was a Florida license in the name of Durojaiye S. Peters. Mr. Ayinde's license was a Georgia license in the name of Victor Olukayode Peters. The defendants told Officer Martin that they were brothers and students, and that they were moving from California to Dallas. Officer Martin also asked the men where they were originally from and was told Nigeria. Officer Martin opined that Mr. Peters and Mr. Ayinde acted "extremely nervous" and were "shaky, sweaty, and kept looking at each other side to side quite often." (R. Vol. II at 21.)

Officer Martin took the licenses back to his patrol car and ran a computer check on them. The check revealed no irregularities.

Apparently satisfied with the identification documents and the suspects' citizenship (R.Vol. II at 37–38), Officer Martin decided to investigate the possibility that the defendants were nervous because they were hauling illegal drugs. Over the radio, he requested a drug-sniffing canine from the highway patrol, but none was available. After returning to the Ryder truck and handing back the defendants' licenses, Officer Martin issued Mr. Peters a written warning for failing to drive in a single lane. He then asked Mr. Peters if he could search the truck. Mr. Peters responded in the affirmative and promptly signed a consent form.

Upon opening the back door of the truck, Officer Martin discovered items typical of a van that was moving its occupants across country. Clothing, boxes, appliances, and other "things that would be inside an apartment or house" were stacked inside. (R.Vol. II at 34.) He conducted a search of the truck's contents, but found no evidence of drugs or any other illegal activity. Later, Officer Martin testified that he was not satisfied with the effectiveness of his search because of the unavailability of the drug-sniffing canine. He also stated that he was unable to search the truck as thoroughly as he would have liked because of the scattered arrangement of its contents. After finishing his search, Officer Martin told Mr. Peters and Mr. Ayinde that they could continue on their way. When the defendants continued to act nervous, even after having been told that they were free to go, Officer Martin developed a hunch that he had missed something when conducting his search, and that the suspects were probably hauling illegal drugs. (R.Vol. II at 36–37.)

Immediately after the encounter, Officer Martin reported to his superior, Lieutenant White, that he "didn't feel good" about the stop because of the suspects' nervousness and his failure to obtain a drug-sniffing canine. (R.Vol. II at 36–37.) He told Lieutenant White that, despite the results of his investigation, he continued to suspect drug activity. (R.Vol. II at 37.) Lieutenant White reported the incident to the Albuquerque office of the Drug Enforcement Administration (DEA), which decided not to follow up on

Officer Martin's hunch. Instead, the DEA referred the matter to Agent Ochoa at the border patrol station in Albuquerque, New Mexico. The DEA provided Agent Ochoa with a description of the truck and its occupants. Agent Ochoa then phoned Lieutenant White in Flagstaff to learn more about the situation. From talking to the DEA agent and to Lieutenant White, Agent Ochoa learned that, although the suspects were originally from Nigeria, a Flagstaff officer had found nothing improper about their identification documents. (R.Vol. II at 134–135.) Agent Ochoa was further informed that a search of the truck performed by the Flagstaff officer had failed to uncover any evidence of illegal activity. (R.Vol. II at 134.) Finally, Agent Ochoa was told that, despite the exculpatory results of the first investigation, the Flagstaff officer remained suspicious of illegal activity because the suspects had acted nervous during the first traffic stop. (R.Vol. II at 107.) Agent Ochoa then calculated the time necessary to drive from Flagstaff to Albuquerque and drove out to the east-west highway at the time he expected the suspects to pass through Albuquerque.

While heading westbound, Agent Ochoa observed a Ryder truck driven by two black males travelling eastbound. Agent Ochoa, who was driving a marked United States Border Patrol car, immediately crossed over the median into the eastbound lanes, joining traffic approximately 200 yards behind the Ryder truck. The truck was proceeding at fifty-five miles per hour. As Agent Ochoa sped to catch up, the truck abruptly changed from the right-hand lane to the left-hand lane. At some point after matching the license plate number with the one provided him by Flagstaff, Agent Ochoa requested back-up support and a drug-sniffing canine. (R.Vol. II at 138.) He then pulled his marked car up alongside the passenger side of the truck and proceeded to "stare" at its occupants. (R.Vol. II at 114.) He saw the driver, later identified as Mr. Peters, looking straight ahead with a firm grip on the wheel. The passenger, Mr. Ayinde, also faced straight ahead, although he kept glancing at Agent Ochoa out of the corner of his eye.

Concluding that such conduct was "nervous behavior," Agent Ochoa executed a traffic stop to continue the investigation. He approached the passenger side of the vehicle and asked the occupants where they were from. Mr. Peters and Mr. Ayinde both responded that they were United States citizens, born in St. Croix, Virgin Islands. Because this information conflicted with what the suspects had told Officer Martin in Flagstaff and because the passengers were shaking and acting nervous, Agent Ochoa continued to question them about their "nationality, their effective mannerisms, their accent, [and] their extreme nervousness." (R.Vol. II at 121–22.) Meanwhile, Officer Montoya of the state police arrived, responding to the request for back-up made by Agent Ochoa prior to making the stop. Officer Montoya began questioning Mr. Peters and quickly obtained consent to perform a second search of the truck. At some point during the questioning, a drug-sniffing canine was brought to the scene by Albuquerque police pursuant to the earlier request.

While Officer Montoya searched the truck, Agent Ochoa continued questioning Mr. Ayinde. When Mr. Ayinde responded that he could not remember his social security number, Agent Ochoa asked him to take out his wallet to look for the card despite the fact that Mr. Ayinde had said he did not have it with him. Apparently, when Mr. Ayinde opened his wallet, Agent Ochoa was able to see "the corner of what appeared . . . to be a counterfeit Social Security [card]." (R.Vol. II at 124.) After obtaining consent to examine the wallet, Agent Ochoa was able to confirm that the social security card was counterfeit. He then placed Mr. Ayinde under arrested "for a violation of the law, mostly immigration," and removed him to the patrol car. (R.Vol. II at 127.) When he told Mr. Peters that Mr. Ayinde's counterfeit social security card had been discovered, Mr. Peters confessed to being an illegal alien from Lagos, Nigeria. Mr. Peters was promptly arrested. A thorough search of the truck revealed false identification documents which had been hidden in a suitcase. No drugs were discovered.

## I.

Because the Fourth Amendment issue surrounding the second stop, *i.e.*, the stop conducted by Agent Ochoa in New Mexico, is clearly dispositive of this case, we need not reach the constitutionality of the first stop or any other argument raised by the defendants in this appeal.

■ *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) permits a law enforcement officer to make a limited "seizure" of an individual suspected of criminal activity if the officer has "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880. It is undisputed that a seizure occurred when Agent Ochoa pulled over the defendants' truck. The only relevant question, therefore, is whether Agent Ochoa had an objective and particularized basis for his suspicions that was reasonable and sufficient to justify the second intrusion. This determination is made by considering the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). The ultimate legal determination of reasonableness under the Fourth Amendment is subject to de novo review. *United States v. Corral*, 970 F.2d 719, 723 (10th Cir.1992).

The government supports the reasonableness of Agent Ochoa's suspicions of an immigration violation on four grounds: 1) Agent Ochoa knew that the suspects were of Nigerian ancestry; 2) the Ryder truck made an "abrupt" lane change when Agent Ochoa began following it; 3) Agent Ochoa had been informed that the defendants acted nervous in Flagstaff; and 4) the suspects exhibited "nervous behavior" while Agent Ochoa drove alongside their truck. (Appellee's Br. at 16.)

■ First, the government argues that Agent Ochoa had grounds to reasonably suspect criminal activity because he had been informed of the defendants' Nigerian ancestry. Even if this fact could provide reasonable suspicion for an immigration violation, it is completely rebutted by Agent Ochoa's knowledge that the first investigation turned up nothing improper about the defendants'

presence in the United States. At the first stop, the defendants stated that they were students from Nigeria, legally residing in the United States. The license check performed by Officer Martin seemed to confirm this status. The contents of the truck corroborated their story that they were students moving across country. There was no factual basis, other than an inarticulable hunch developed by Officer Martin, to suspect that the defendants' statements were not completely accurate. Indeed, nothing in the record up to this point casts any doubt upon their explanation. The results of the initial stop in Flagstaff, without any new information, dispelled any reasonable suspicion of illegal activity as a matter of law.

■ The properly executed lane change, which the government characterizes as "abrupt," likewise fails to provide a basis to reasonably suspect illegal activity. Agent Ochoa testified that he made the traffic stop because he suspected an immigration violation. (R.Vol. II at 116.) The government apparently suggests that the act of changing lanes while being followed by a law enforcement officer is indicative of an immigration violation. We hold that a single, legal lane change cannot provide grounds for reasonable suspicion of an immigration violation under any circumstances. At oral argument, the government argued for the first time that the Ryder truck repeatedly weaved while Agent Ochoa was following it. There is no support in the record for this assertion; rather, the record is clear that the Ryder truck made no illegal movements during this period. We decline to interpret a legal and properly executed lane change, even if "abrupt," as "weaving."

Finally, the government points to the defendants' nervous conduct during the first stop in Flagstaff and again while Agent Ochoa drove alongside their truck in Albuquerque. "While a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials...." *United States v. Hall*, 978 F.2d 616, 621 n. 4 (10th Cir.1992).

First, we note that the record does not support the government's claim that the defendants behaved nervously when being followed in Albuquerque. The rented truck was proceeding at fifty-five miles per hour in a zone where sixty-five miles per hour is permitted. The government apparently urges that slow driving is indicative of nervousness. However, the cautious driving of a rented moving truck, whose drivers are often inexperienced with the operation of large vehicles, cannot standing alone support a reasonable suspicion of illegal activity.

The government's claim that Mr. Peters was visibly nervous is based on Agent Ochoa's stated observation that when he drove beside his van, Mr. Peters was gripping the wheel tightly and looking straight ahead at the road. Again, we fail to see the nexus between careful driving and illegal conduct. The only probative evidence of nervous conduct cited by the government is Mr. Ayinde's looking at Agent Ochoa out of the corner of his eye while facing forward. In light of Agent Ochoa's knowledge that the defendants had already been stopped once that day and had been searched to no avail, Mr. Ayinde's sideways glances are simply insufficient to support a reasonable suspicion of illegal activities. Such conduct is consistent with how a typical United States-born citizen might respond if, after already having been pulled over and searched earlier that day, a law enforcement official followed him in a marked car, pulled up alongside of his car, and then proceeded to stare at him intently.

Moreover, nervous behavior had already been exhausted as a ground to support a second stop by Officer Martin or another officer who had been contacted by Officer Martin. According to *Terry*, when an officer observes "unusual conduct which leads him reasonably to conclude ... that criminal conduct may be afoot," he may perform an investigation as long as "nothing in the initial stages of the encounter serves to dispel" his fears and suspicions. *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884. Similarly, the Supreme Court in *United States v. Place*, 462 U.S. 696, 717, 103 S.Ct. 2637, 2649, 77 L.Ed.2d 110 (1983), held that if probable cause is not developed during a *Terry*-type encounter, the officer must release the suspect. This is the case because when reasonable suspicion has been dispelled or probable cause has not developed, the conduct upon which the officer originally based his suspicions has proved to be an illusory ground for suspicion under the particular circumstances, and thus, has been exhausted. Being illusory, the ground no longer reasonably supports a continuation of the search. Absent a new and independent basis for suspicion, the officer must halt his investigation in accordance with *Terry* and *Place*.

Of course, a second officer who is unaware of the fruitless search conducted earlier may initiate his own investigation based on the same "suspicious" behavior that was exhausted by the first officer's failed investigation. The officer who performed the original investigation, however, may not release the suspect as required by *Terry* and *Place*, wait until he has travelled down the road a few miles, and then make a second *Terry* stop based solely on the conduct that has already proved to be illusory. Similarly, the officer cannot circumvent *Terry* and *Place* by calling upon a different officer to make the second intrusion in his stead.

In this case, Officer Martin became suspicious and decided to search for drugs solely because of the defendants' nervous behavior. He checked the defendants' driver's licenses, and both were reported as valid. He performed a search of the vehicle and discovered nothing incriminating. What he did find in the truck only confirmed the defendants' story. Having no grounds upon which he could continue to detain the suspects, Officer Martin allowed them to continue on their way. At this point, nervous behavior had been exhausted as a ground for suspicion, and thus, it would have been unreasonable for Officer Martin to have stopped the suspects again a few minutes later based solely on a claim that they were once again acting nervous in his presence. Likewise, it would contravene the teachings of *Terry* and *Place* to allow Agent Ochoa to make the second stop based on nothing more than the information provided him about Officer Martin's encounter and a repeat occurrence of the

same "suspicious" conduct that Agent Ochoa knew had proved illusory at the earlier stop. Thus, we hold that even if the suspects had acted nervous in Agent Ochoa's presence prior to the second stop, nervous behavior could not reasonably have served as the sole basis for his suspicion under the facts of this case.

In sum, there is no basis in the record to support the government's claim that Agent Ochoa made the Albuquerque traffic stop on reasonable suspicion. We hold that the second stop of Mr. Peters and Mr. Ayinde violated the Fourth Amendment as a matter of law.

## II.

Because the stop was illegal, we must determine whether the government has shown that the subsequent incriminating statements and consents to search were not fruit of the illegal stop, but rather were obtained by "means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963). *See also United States v. Mendoza–Salgado,* 964 F.2d 993, 1010 (10th Cir.1992); and *United States v. Maez,* 872 F.2d 1444, 1456–57 (10th Cir. 1989).

To determine whether the defendants' statements were purged of the taint from the unlawful invasion, we apply the analysis set forth in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). *See Mendoza–Salgado,* 964 F.2d at 1010–11; *Maez,* 872 F.2d at 1456–57. In *Brown,* the Supreme Court identified four factors relevant to the determination of whether statements made to the police after an illegal seizure are admissible or sufficient to constitute voluntary consent: 1) whether the suspects were advised of their *Miranda* rights prior to making the statements at issue; 2) the temporal proximity of the statements to the Fourth Amendment violation; 3) the existence of intervening causes between the violation and the statements; and 4) the purpose or flagrancy of the official misconduct. *Brown,* 422 U.S. at 603–604, 95 S.Ct. at 2261–62.

 We hold that the consents and incriminating statements should have been suppressed as "fruit of the poisonous tree." All four prongs of the *Brown* test compel this result. The defendants were not advised of their *Miranda* rights prior to making statements and giving consent. The statements and consents were obtained just moments after the suspects were illegally pulled over. There were no intervening causes in this short period of time to indicate that the incriminating evidence was not a product of the illegal stop. Finally, Agent Ochoa's conduct bordered on harassment. Acting solely on an unsupported, inarticulable "hunch" supplied by another officer, after the suspects have already been exonerated by a previous investigation, is flagrant misconduct under the Fourth Amendment.

In summary, the district court erred in denying the defendants' motion to suppress the incriminating evidence. The decision of the district court is REVERSED.