Alexandria
SANJAY X. JHA
v.
COMMONWEALTH OF VIRGINIA
No. 1646-92-4
Decided May 17, 1994

COUNSEL

Thomas C. Carter (Carter, Kramer & Ragland, P.C., on brief), for appellant.

H. Elizabeth Shaffer, Assistant Attorney General (Stephen D. Rosenthal, Attorney General, on brief), for appellee.

OPINION

**BAKER, J.**—Sanjay X. Jha (appellant) appeals from his bench trial conviction by the Circuit Court of Fairfax County (trial court) for feloniously and fraudulently obtaining telephone services in violation of Code § 18.2-187.1(B). Appellant contends that the police illegally seized his vehicle and that the inculpatory evidence found therein and used against him at trial was inadmissible. In addition, appellant asserts that the Commonwealth failed to prove that the value of the telephone services fraudulently procured exceeded $200. Finding no error, we affirm the judgment of the trial court.

Shortly after midnight on April 1, 1992, Fairfax County Police Officer James Wade (Wade) responded to a dispatch of a suspicious person behind Tower Shopping Center in Springfield. As Wade arrived in his marked police cruiser, he observed appellant standing at the back door of J.L. Hammett Company's Store (Hammett's) with his hands slightly raised. Wade suspected that appellant was attempting to break into the store. Appellant apparently sighted Wade and ran from the scene. A chase ensued. Wade, on foot, ran after appellant through a tire store property, across a road, into a restaurant parking lot, around the restaurant, through a muffler shop property, and onto a gas station lot. Fairfax Police Officer Robert Bond (Bond) had been alerted by the suspicious person dispatch and while remaining in an unmarked police cruiser had appellant under surveillance from a distance. Bond drove onto the gas station lot, left his vehicle, and

detained appellant. Appellant gave the officers his name and his date of birth as November 19, 1969. Wade searched appellant and found a device with a socket on it similar to a screwdriver. A consensual search of appellant's vehicle revealed a computer keyboard and a radio. At that time, the police had discovered no violation, and after appellant informed the officers that he was going to return to his home in Haymarket, he was released. While Bond and other officers continued to keep appellant under surveillance, Wade searched in the area of Hammett's, where he had first sighted appellant. Wade found no evidence of a break-in but discovered that a telephone junction box, in the area appellant was first observed, was open with its wires exposed. The box was low enough to be within appellant's reach.

The suspicious person dispatch had also been heard by Fairfax Police Officers Matthew Pifer (Pifer) and Walter Smallwood (Smallwood). The officers remained suspicious of appellant's midnight activity. When appellant turned his vehicle away from the direction of Haymarket, they followed him as he drove onto Interstate 95 and exited into the Kingstowne Village development on Palladium Court. The officers then lost sight of appellant for five to seven minutes. While Pifer and Smallwood remained at the entrance to Palladium Court, Bond exited his vehicle and again observed appellant. Bond walked behind a building to prevent appellant from seeing him but returned to the sidewalk when he was advised by Pifer and Smallwood that appellant was "coming out of his vehicle." Bond then observed the vent window of a parked van that had been "smashed." Suspecting that appellant might have been involved, Bond notified the other officers of his find and advised them to continue their surveillance of appellant. Having been told by appellant that his home was in Haymarket, Pifer knew that appellant did not live in the Kingstowne area. It was approximately 1:00 a.m., appellant was "wandering around" in an area in which he did not live, and a van that appeared to have been broken into was discovered nearby.

As Pifer approached appellant to obtain his driver's license and identification, Pifer could see inside appellant's vehicle. In plain view, he observed "a phone butt." Appellant consented to the police request to search his vehicle. Appellant admitted that the "butt pack" was his but refused to give the name of the person from whom he had obtained it. Appellant was again released.

However, later that day, the officers contacted the telephone company and learned that a phone butt is used to tap into telephone lines.

Ann Weinhold, the manager at Hammett's, testified that on March 31, 1992, she left and locked the store at 6:05 p.m. On April 11, 1992, Weinhold received an American Telephone and Telegraph Company (AT&T) bill for Hammett's in the amount of $300.85 for eight unauthorized calls to a 900 number. The telephone closet for the store is located in the back alley behind the store. Appellant was never given permission to use the phone.

In early May 1992, Craig Evers (Evers), a psychic counselor with a 900 number, began receiving calls from appellant. Appellant told Evers that he had been arrested on March 31, 1992, for using a telephone illegally in an alley. On May 13, Evers received five calls from appellant. Appellant gave his date of birth, November 19, 1969, for his horoscope and continued to describe the March 31 arrest, saying "I was caught making phone calls in the alley" and that he had used a "telephone lineman's type phone" which connected to the junction boxes on the outside of the building. Appellant also said that he did not believe the police had a strong case against him because they did not find the telephone until later. He explained that his girlfriend had rejected him and this caused him to call psychics all day long with the use of the lineman's telephone. Appellant thought he had run up $25,000 in unauthorized calls.

Susan Davy (Davy), the investigations manager for AT&T, testified that part of the $300.85 bill is paid to the 900 service subscriber, and Davy was unable to determine AT&T's precise share of the loss. The trial court commented that Code § 18.2-187.1 "talks" only in terms of the value of the service and said:

> I conclude as a matter of law that so long as she's saying that the value of the service is three hundred dollars, which is what she's saying, that complies with the Code, and it's irrelevant that AT&T may have some agreement with the psychic number where they're going to pay them a certain amount. The value of the service is the three hundred dollars.

In relevant part, Code § 18.2-187.1 provides:

B. It shall be unlawful for any person to obtain or attempt to obtain oil, electric, gas, water, telephone, telegraph, or cable television service by the use of any scheme, device, means or method, or by a false application for service with intent to avoid payment of lawful charges therefor.

\* \* \* \* \* \* \*

D. Any person who violates any provisions of this section, if the value of service, credit or benefit procured is $200 or more, shall be guilty of a Class 6 felony; or if the value is less than $200, shall be guilty of a Class 1 misdemeanor.

Appellant argues that when the police detained him in the Palladium Court area, they did not have an articulable suspicion to believe that criminal activity was afoot and, therefore, the trial court erred when it refused to suppress the "phone butt" evidence that led to the discovery of his illegal telephone calls. We disagree.

When a motion to suppress is reviewed on appeal, the burden is on appellant to show, when the evidence is viewed in the light most favorable to the Commonwealth, that the trial court's ruling was "plainly wrong." *Mu'Min v. Commonwealth*, 239 Va. 433, 440, 389 S.E.2d 886, 891 (1990), *aff'd*, 500 U.S. 415 (1991). An investigatory stop must be based on articulable facts which create a reasonable suspicion that the defendant is engaged in criminal activity. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The determination must be based on the circumstances. *United States v. Cortez*, 449 U.S. 411, 418 (1981). The standard for the warrantless stop is whether, based on the totality of those circumstances objectively viewed, the police could entertain a reasonable suspicion that the party may have been involved in criminal activity. *Zimmerman v. Commonwealth*, 234 Va. 609, 612, 363 S.E.2d 708, 709 (1988).

When the police initially stopped appellant, it was midnight, six hours after Hammett's had closed. They had received a report that a suspicious person was in the area of that store. Upon arrival, they observed appellant standing with his hands raised near an open telephone box with exposed wires. Appellant fled. When detained, appellant stated that he lived in Haymarket and intended to return home. Instead, appellant drove in the opposite

direction, entered a residential area in which he did not live, got out of his car, and proceeded to walk around. Appellant was detained only after the police found a van, with a broken window and glass lying on the seat, in the area in which appellant had just been walking.

Once police found nothing illegal from the first stop, they were not required to ignore the facts that triggered it, and thus, were not precluded from using those facts in establishing probable cause for the second detention. *See United States v. Ilazi*, 730 F.2d 1120, 1126 (8th Cir. 1984) (successive investigatory stops are not, *per se*, coercive even when based upon same information). The assessment of a *Terry* stop must be based on the totality of the circumstances. *Cortez*, 449 U.S. at 418. Moreover, appellant's flight from police and contradictory behavior in driving in the opposite direction are not innocent occurrences from a law enforcement perspective. We find that the trial court did not err when it refused to suppress evidence which led to the discovery that appellant violated the provisions of Code § 18.2-187.1.

■ Appellant further argues that the evidence is insufficient to prove that his unlawful conduct was felonious because none of the individual calls he made were shown to have a value in excess of $200. The issue is whether, under the facts of this case, aggregation of the value of individual calls made in violation of Code § 18.2-187.1 is permitted to prove that the unlawful conduct is a felony. Although that Code section contains no specific language relative to such aggregation, prior Virginia larceny cases support the trial court's judgment. In *West v. Commonwealth*, 125 Va. 747, 754, 99 S.E. 654, 656 (1919), the Court said:

> [A] series of larcenous acts, regardless of the amount and value of the separate parcels or articles taken, and regardless of the time occupied in the performance, may and will constitute, in contemplation of law, a single larceny, provided the several acts are done pursuant to a single impulse and in execution of a general fraudulent scheme.

(citations omitted.)

In a similar case, the Court affirmed that holding and held that where the value of all the stolen items received, pursuant to a "single impulse" of the accused and in execution of a "general

fraudulent scheme," amounted to a sum of $50[1] or more, the accused was guilty of grand larceny. *See Omohundro v. Commonwealth*, 138 Va. 854, 866, 121 S.E. 908, 911 (1924).

Here, the unlawful calls for which appellant was indicted all occurred within approximately one hour of one another and were "in execution of a general fraudulent scheme." For that reason, a finding by the fact finder that the value of the calls was in excess of $200 is supported by the evidence.

Appellant further argues that the indictment alleges that the loss of the value of the calls, $300.85, was incurred by AT&T. Therefore, because the evidence disclosed that AT&T's loss was only a portion of the $300.85, appellant asserts that it has not been shown that AT&T sustained a loss sufficient to prove the felony. We agree with the trial court's finding that the value of the service fraudulently obtained was proved to be $300.85, and the terms of its disposition by AT&T, if collected, do not reduce the value of the service so obtained.

For the reasons stated, the judgment of the trial court is affirmed.

*Affirmed.*

Barrow, J., and Fitzpatrick, J., concurred.

---

[1] Code § 18.2-95(ii) now defines grand larceny as the "simple larceny not from the person of another of goods and chattels of the value of $200 or more."