COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Coleman and Senior Judge Cole
Argued at Richmond, Virginia


LEONARD SHELTON JACKSON
                                              OPINION BY
v.   Record No. 2035-94-2            JUDGE MARVIN F. COLE
                                            APRIL 30, 1996
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                    James B. Wilkinson, Judge

          Maureen L. White, Assistant Public Defender
          (David J. Johnson, Public Defender, on
          brief), for appellant.

          H. Elizabeth Shaffer, Assistant Attorney
          General (James S. Gilmore, III, Attorney
          General, on brief), for appellee.



     Leonard Shelton Jackson appeals his conviction for

possessing cocaine with the intent to distribute.  He contends

that the trial court erred in denying his motion to suppress the

cocaine.  Finding no error, we affirm.

     In reviewing a trial court's denial of a motion to suppress,

"the burden is upon [the appellant] to show that this ruling,

when the evidence is considered most favorably to the

Commonwealth, constituted reversible error."  Fore v.

Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731, cert.

denied, 449 U.S. 1017 (1980).

                          **BACKGROUND**

     In the early hours of April 14, 1994, while working off-duty

in a high-crime area, Officer John Bandy "saw muzzle flash" and

"heard several shots [fired] from handguns."  Bandy saw a group

of seven or eight people standing in the area where the shots originated.  A tan Oldsmobile was parked near the group.  As Bandy approached to investigate,

> several subjects evidently saw [him] or
> something, because they went to the
> Oldsmobile, went inside the Oldsmobile.  The
> doors opened and so forth.  The trunk opened.
>  The trunk was shut, the doors were shut, and
> [Bandy] went up to the subjects[, who had
> walked away from the car,] and started
> patting down a couple of the subjects
> [including appellant] for weapons.

Bandy found a pager on appellant, but discovered no weapon on him.  Bandy testified that he also "comb[ed] the area" and found no weapon.

When Officer Stephanie Davis arrived in a marked cruiser, Bandy told her what he had seen.  Bandy told Davis "to go around the corner [and wait] . . . , they're probably going to come back to the car and get the guns back out."  Bandy watched the area and saw "[t]hree subjects g[e]t into the car."  A fourth subject stood on the corner as an apparent lookout.  The car's lights came on "as if the car was going to" leave.  Bandy radioed for Davis to approach the area, but when her police cruiser approached, the lookout "holler[ed] something at the car," causing the three people in the car to get out of the car and run behind an apartment building.  Bandy again told Davis to park out of sight; he told Davis that he would signal her when the Oldsmobile left.  After Davis left the area, the subjects entered the vehicle and drove away.  Davis followed the car, and Bandy

2

followed Davis in his personal vehicle.  Davis stopped the car, and appellant, who was driving, got out and began to walk toward some apartments.  Davis ordered appellant to get back in the car.

Appellant had no driver's license, and he "gave [Bandy] permission to search the car."  Bandy found no contraband in the passenger area.  Bandy then asked whether he could search the trunk, and, although Bandy saw appellant open the trunk earlier, appellant said the trunk was broken.  Appellant told Bandy, "if you can get into [the trunk] you can search it."  Bandy was able to open the trunk.  Inside the trunk, Bandy found a jacket; in the jacket, Davis found a bag containing cocaine.  The three occupants of the car were arrested.

The female passenger told Bandy that appellant "had some more cocaine in his crotch area."  The police recovered a pager and $394 in currency from appellant.  Bandy stated that his main concern in stopping the car was "because of [the possibility that] the gun [was] in the car."  Bandy explained that he "was acting on the original gunfire and him [appellant] going to the vehicle shortly after the gunfire."  Bandy also stated that he searched the area of the gunshots.

Officer Davis testified that she "got a promiscuous shooting call a little bit before there was a call [from Bandy] for assistance, and [Bandy] needed a patrol unit to assist him on a person or persons possibly still had a gun on them or in the car."  Davis corroborated Bandy's account of appellant and two

3

other subjects entering the car, seeing the police drive up, getting out of the car, and returning to the car later.  When appellant drove away, Davis followed.  When she activated her emergency lights, appellant's "car sped away . . . and made a right turn" and stopped.  Davis "saw a lot of movement in the car.  Everyone in the car was bending down.  I couldn't tell if they were reaching or what they were doing.  There was just a lot of movement in the vehicle."  Davis thought the occupants were possibly "trying to hide some kind of weapon."  Davis' primary concern at the time was her "safety, the officer's safety around me, because of the weapons."  When appellant got out of the car and began walking away, Davis pulled her weapon and told him to wait in the car.

**ANALYSIS**

Appellant contends that the police unlawfully stopped his car.  According to appellant, because the earlier patdown of appellant by Bandy yielded no contraband, the second stop of appellant and his car was, at a minimum, an unlawful stop under Terry v. Ohio, 392 U.S. 1 (1968), and possibly an unlawful arrest.

"'If there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information.'"  Williams v. Commonwealth, 4 Va. App.

4

53, 64, 354 S.E.2d 79, 85 (1987) (quoting Hayes v. Florida, 470 U.S. 811, 816 (1985)). "[W]hether [a] stop [i]s justified is dependent upon whether 'the facts available to the officer at the moment of the seizure or the search [would] "warrant a man of reasonable caution in the belief" that the action was appropriate.'" Quigley v. Commonwealth, 14 Va. App. 28, 32, 414 S.E.2d 851, 853-54 (1992) (quoting Terry v. Ohio, 392 U.S 1, 21-22 (1968)).

Bandy possessed probable cause to believe that a crime had been committed when he saw and heard gunfire. E.g., Code §§ 18.2-280 (willfully discharging firearm in public place, a Class 4 felony or Class 1 misdemeanor, depending on the location), 18.2-286 (shooting in or across a street, a Class 4 misdemeanor), 18.2-286.1 (shooting from vehicle, a Class 5 felony). Therefore, at a minimum, Bandy was justified in briefly detaining the group of people to inquire about the crime and to pat them down for weapons pursuant to Terry if he reasonably feared for his safety. 392 U.S at 21. Appellant concedes that the initial patdown was proper and lawful under Terry. However, the critical issue is whether the stop of appellant's car, after the initial unsuccessful patdown, was lawful, and, if so, upon what basis.

When Bandy's initial patdown of the appellant and search of the area around the vehicle failed to disclose a weapon, Bandy left the immediate area to observe and investigate further.

5

Although he had seen several people enter and exit the car, Bandy did not know who owned the car and whether the car was capable of being driven. Bandy kept in contact with Davis in case his observations revealed that the car was operational and that someone intended to drive it out of the area while it contained a hidden weapon. During his surveillance, Bandy acquired additional information linking the car with the group, and, specifically, the driver and probable owner. After the car drove away, Bandy directed Davis to follow and stop it.

Davis, who received a dispatch of the shooting, saw appellant and the two passengers act suspiciously when she initially approached the Oldsmobile. Later, when the car left the scene, she stopped it.

Because appellant was in the car, he asserts that the stop was another Terry stop based on the same information possessed by the police when they patted him down. However, the stop of the car was based on newly acquired information, linking appellant with possession of the car. Therefore, the stop of appellant's car was justified as a Terry stop.

> "A police officer may stop a motor vehicle, without probable cause, for investigatory purposes if [the officer] possesses a reasonable and articulable suspicion 'that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law.'" Bulatko v. Commonwealth, 16 Va. App. 135, 136-37, 428 S.E.2d 306, 307 (1993) (quoting Waugh v. Commonwealth, 12 Va. App. 620, 621-22, 405 S.E.2d 429, 429 (1991)). Although the Commonwealth has the burden of proving that such

6

> an investigatory stop is lawful, the level of suspicion required for an investigatory stop is less demanding than the standard of probable cause. Id. There are no bright line rules to follow when determining whether a reasonable and articulable suspicion exists to justify an investigatory stop. Instead, courts must consider "the totality of the circumstances--the whole picture." United States v. Sokolow, 490 U.S. 1, 8, (1989). "In evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." United States v. Sharpe, 470 U.S. 675, 685 (1985).

Hoye v. Commonwealth, 18 Va. App. 132, 134-35, 442 S.E.2d 404, 406 (1994). See also Delaware v. Prouse, 440 U.S. 648, 653-54 (1979); Terry, 392 U.S. at 21; Murphy v. Commonwealth, 9 Va. App. 139, 143, 384 S.E.2d 125, 127-28 (1989).

In Adams v. Williams, 407 U.S. 143 (1972), the Supreme Court recognized the need for police officers to adopt an "intermediate response" rather than ignore a dangerous situation and allow a possible crime to go uninvestigated. Justice Rehnquist stated in Adams:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

Id. at 145-46 (citations omitted).

7

Successive investigatory Terry stops of a possible suspect are not per se unlawful. See United States v. Ilazi, 730 F.2d 1120, 1125-26 (8th Cir. 1984).

> To so hold would preclude law enforcement officials from stopping a suspect a second time whenever the first stop did not provide probable cause, even though it tended to confirm their suspicions of illegal activity. We believe that to adopt a per se rule prohibiting successive investigatory stops would unduly hinder efforts to interdict illegal [behavior].

Id. at 1126. See also State v. Aillon, 521 A.2d 555, 563 (Conn. 1987) (approving "second stop" that "ha[s] a different impetus," or is based on different facts); United States v. Peters, 10 F.3d 1517, 1523 (10th Cir. 1993) (holding successive stop illegal absent additional, new basis for second stop).

In Jha v. Commonwealth, 18 Va. App. 349, 444 S.E.2d 258 (1994), we approved a second Terry stop of a suspect where police officers obtained additional information that was properly considered with the initial information. We explained that, after the police find nothing illegal from a first Terry stop, "they [a]re not required to ignore the facts that triggered it, and thus, [a]re not precluded from using those facts in establishing probable cause for [a] second detention." Jha, 18 Va. App. at 354, 444 S.E.2d at 260 (citing Ilazi, 730 F.2d at 1126).

Viewing the totality of the circumstances underlying the stop of appellant's car, we consider the information possessed by

8

the police at the time of the initial patdown/<u>Terry</u> stop (the old information) in conjunction with information acquired after the patdown/<u>Terry</u> stop (the new information).

From the old information, the police knew that a crime had been committed, that the weapon had not been recovered, and that it might be concealed or hidden in the area or in the car. The unsuccessful patdown established that appellant or others in the group did not physically possess the weapon. Although Bandy saw suspicious activity involving the car, no evidence established who owned the car. Moreover, it was operational and mobile, and, thus, capable of transporting a hidden weapon.

The warrantless search of an automobile, "where there are both probable cause to believe the car contains evidence of crime and exigent circumstances," is a well established exception to the warrant requirement. <u>McCary v. Commonwealth</u>, 228 Va. 219, 227, 321 S.E.2d 637, 641 (1984).

Instead of forcibly entering the stationary car and searching it, Bandy and Davis waited and observed. During their observations, the officers gained additional information. They saw three suspects enter the car while a lookout stationed himself on the corner. When Davis approached the car, the lookout signaled to the three occupants, who got out of the car. Finally, Bandy and Davis saw a suspect from the group (appellant) drive the vehicle from the area.

Therefore, the police gained additional evidence after the

unsuccessful patdown of appellant to justify the stop of the car. They observed three people enter the parked car, saw one of the group members take control of the car, and learned that the car was operational, and, thus, had the ability to leave the area and possibly transport a hidden weapon to another location.

The combined effect of the old and new information provided Bandy and Davis with sufficient reasonable and articulable suspicion that the occupants and/or vehicle were subject to seizure.

After appellant stopped his car, got out, and tried to leave, Davis had authority to maintain the status quo and order him to remain there. "Once an officer has lawfully stopped a suspect, he is 'authorized to take such steps as [are] reasonably necessary to protect [his and others'] personal safety and to maintain the status quo during the course of the stop.'" Servis v. Commonwealth, 6 Va. App. 507, 519, 371 S.E.2d 156, 162 (1988) (quoting United States v. Hensley, 469 U.S. 221, 235 (1985)). See also Terry, 392 U.S. at 27; United States v. Crittendon, 883 F.2d 326, 329 (4th Cir. 1989) (holding that the use of handcuffs during an investigatory stop is permissible to maintain the status quo or to protect the officer).

Because the stop was justified, appellant's consent was not tainted. Accordingly, we find that the trial court did not err in denying appellant's motion to suppress.

Affirmed.

10

BENTON, J., dissenting.


When Officer Bandy first detained Leonard Shelton Jackson, he discovered no evidence to suggest that Jackson might have been involved in the discharge of a weapon. Because Officer Bandy did not obtain evidence of criminal activity either during or after the search, I would hold that the second detention violated Jackson's fourth amendment right to be free from "'unreasonable searches and seizures.'" Terry v. Ohio, 392 U.S. 1, 9 (1968)(quoting Elkins v. United States, 364 U.S. 206, 222 (1960)).

> [I]f probable cause is not developed during a Terry-type encounter, the officer must release the suspect. This is the case because when reasonable suspicion has been dispelled or probable cause has not developed, the conduct upon which the officer originally based his suspicions has proved to be an illusory ground for suspicion under the particular circumstances, and thus, has been exhausted. Being illusory, the ground no longer reasonably supports a continuation of the search. Absent a new and independent basis for suspicion, the officer must halt his investigation in accordance with Terry and [United States v.] Place [, 462 U.S. 696 (1983)].
>
> Of course, a second officer who is unaware of the fruitless search conducted earlier may initiate his own investigation based on the same "suspicious" behavior that was exhausted by the first officer's failed investigation. The officer who performed the original investigation, however, may not release the suspect as required by Terry and Place, wait until he has travelled down the road a few miles, and then make a second Terry stop based solely on the conduct that has already proved to be illusory.

11

> Similarly, the officer cannot circumvent
> <u>Terry</u> and <u>Place</u> by calling upon a different
> officer to make the second intrusion in his
> stead.

<u>United States v. Peters</u>, 10 F.3d 1517, 1522 (10th Cir. 1993).

The evidence proved that after Officer Bandy heard several shots from a handgun he looked up a hill and saw seven or eight people standing around. He "saw [a] muzzle flash in the area." Officer Bandy heard the radio dispatcher broadcast a report of gunfire, told the dispatcher he was in the area, and walked toward the assembled group. As he approached, he saw several individuals walk to an automobile, and he saw doors and the trunk opened and closed. Two to five minutes passed before he reached the individuals. He concluded that they went to the automobile because "several subjects evidently saw [him] or something." When Officer Bandy arrived at the automobile, he detained several persons and "started patting down a couple of the subjects [, including Jackson] for weapons." Several individuals walked away, however, and were not detained or frisked.

When Officer Davis arrived in her vehicle, Officer Bandy told her what he had observed and done. Officer Bandy had not discovered a gun and did not arrest the individuals who he had detained and frisked. Officer Davis drove away. Although Officer Bandy walked away, he continued to watch Jackson and the remaining individuals. He did not see a gun or hear any more gunfire.

12

After Officer Bandy walked away, he saw four individuals return to the automobile. Three of the individuals entered the automobile and one remained outside. Officer Davis then returned and drove by the automobile. She saw the individuals leave the automobile, go to another vehicle across the street, and lean on it. Officer Davis again drove away.

When Officer Davis drove away, the individuals returned to the automobile and drove away. Officer Bandy contacted Officer Davis and asked her to stop the automobile. Officer Bandy testified that he asked Officer Davis to stop the automobile Jackson was driving because he suspected that a gun was in the automobile. No gun was found in the automobile during the search.

When viewed "objectively through the eyes of a reasonable police officer," Murphy v. Commonwealth, 9 Va. App. 139, 144, 384 S.E.2d 125, 128 (1989), the circumstances that the officers observed after Officer Bandy detained and frisked Jackson did not amount to a reasonable suspicion that Jackson or anyone in the automobile possessed a gun. That three people entered the car and were capable of leaving the area by automobile and not by foot did not contribute to reasonable suspicion that they possessed a gun.

Furthermore, when Officer Bandy first detained and searched Jackson, he knew that several individuals had quickly walked away and left the area. The officer did not eliminate the likely

13

possibility that the persons who walked away had the gun. He knew, however, that Jackson and the persons he frisked near the automobile did not possess a gun.

The purpose of a <u>Terry</u> stop is to promptly dispel or confirm an officer's suspicions. 392 U.S. at 30. Since "probable cause [was] not developed, the conduct upon which [Officer Bandy] originally based his suspicions . . . under the particular circumstances, [was] exhausted." <u>Peters</u>, 10 F.3d at 1522. Without a "new and independent basis for suspicion" Officer Bandy could not continue the detention. <u>Id.</u> When Officer Bandy told Officer Davis to stop the automobile, the officers conducted an unlawful <u>Terry</u> stop.

The cases that have addressed the legality of successive detentions have generally held that government agents may not detain an individual a second time upon the same suspicions of criminal activity. In <u>Peters</u>, an Arizona police officer stopped a rental truck for erratic driving. 10 F.3d at 1519. After checking the driver's and passenger's identification and observing that they were extremely nervous, the officer concluded that they possessed drugs and asked for consent to search the truck. Failing to find any drugs during his search, the officer allowed the driver to leave and relayed his suspicions to a border patrol agent. The agent followed the truck and observed it make an abrupt lane change. When the agent looked at the occupants, he concluded that the driver and passenger were

14

nervous and stopped them on suspicion of carrying illegal narcotics. Id. at 1519-20. The Court ruled that the second Terry stop was unlawful because there was no "new and independent basis" for a search. Id. at 1522.

United States v. Miranda-Garcia, 23 F.3d 1331 (8th Cir. 1994), involved similar circumstances. A police officer stopped a rental truck after he saw it swerving on the interstate. He issued the driver a warning ticket, inquired about weapons and narcotics, and conducted a brief search of the truck with the occupant's consent. After allowing the driver and passenger to leave, the officer learned that the passenger had been arrested on a firearms violation. The officer asked his dispatcher to send a drug-trained dog and requested another officer to stop the truck. Id. at 1333. Following a second search, the officer discovered cocaine in the truck's cab. Id. at 1333-34.

The court held that the second detention violated the fourth amendment because the agent had no reasonable suspicion of criminal activity. Id. at 1336. The officer saw a traffic violation and suspected criminal activity during the first detention; however, the only additional information to justify the second stop was the report of a previous firearm violation. That information did not suggest criminal activity was ongoing, and, therefore, the officer had no more reasonable suspicion during the second detention than the first. Id. at 1335-36.

Relying principally upon United States v. Ilazi, 730 F.2d

1120 (8th Cir. 1984), and Jha v. Commonwealth, 18 Va. App. 349, 444 S.E.2d 258 (1994), the majority upholds the second detention in this case. Those cases do not support the majority's conclusion. In Ilazi, the defendant did not contest the finding "that reasonable suspicion also justified the [second] stop . . . but argue[d] instead that the second stop, occurring as it did soon after the initial stop . . . constituted an arrest without probable cause." Id. at 1125. The police discovered during the first detention that the defendant was an alien carrying identification papers with two different names, that defendant was traveling with another alien who had no passport, and that defendant had no luggage. The Court ruled that the first detention "tended to confirm [the officers'] suspicions of illegal activity" and held that the second detention did not constitute an arrest without probable cause. Id. at 1126. That holding is not relevant to the issue in this case.

Although in Jha this Court upheld a second detention of a suspect within an hour of the first detention, the issue of successive Terry detentions was not raised. Moreover, during the intervening hour, the police observed additional suspicious behavior that supported the second detention. The police first detained Jha when they were investigating a call about a suspicious person behind a store. The officer saw Jha outside the rear door of a store with his hand raised as if attempting to break into the store. After Jha ran, an officer detained him.

16

During a search of Jha and his vehicle, the officer found a screwdriver-like device, a computer device, and a radio. After the officer released Jha, the officer discovered a telephone junction box open with wires exposed in the area behind the store where Jha had been. Id. at 350-51, 444 S.E.2d at 259.

Other officers who heard the report followed Jha. Jha drove away from the store and into a development. The officers following Jha noticed that a vehicle's window had been smashed in the area where Jha had been. The officer then approached Jha to get identification and saw in plain view a device that was used to tap into telephone lines. This Court ruled that Jha "was detained only after the police found a van, with a broken window and glass lying on the seat, in the area in which [Jha] had just been walking." Id. at 354, 444 S.E.2d at 260. This additional cause to believe Jha had committed another offense distinguishes the detention of Jha from that of Jackson.

The reasoning and analysis in United States v. Morin, 665 F.2d 765 (5th Cir. 1982), is more pertinent to this case. A police officer suspected Morin might be smuggling drugs and detained him in the Dallas airport. After making inquiries, the officer released Morin and allowed him to board his airplane. The officer then notified officers in the Austin airport of his suspicions. Relying solely on the Dallas officer's suspicions, officers in Austin approached Morin and again detained him. Acknowledging "[t]he coercion inherent in the successive stop

17

situation," the court ruled that "successive stops of an individual based on the same information strongly indicate a finding that an arrest has taken place." Id. at 769. The Court found that in the absence of probable cause the second stop amounted to an unlawful second fourth amendment seizure because both stops were based on the same information. Id.

The record reveals that Officer Bandy ordered the car stopped for the same reasons he conducted the first stop -- a suspicion that someone may have possessed a gun. Applying the analysis in the foregoing cases, I would hold that Officers Davis and Bandy unlawfully conducted successive detentions based upon the same information. The second detention was not predicated upon any violation of law. The officers did not obtain any "new" information. They relied on "old" information and detained Jackson without a reasonable articulable suspicion of criminal activity. Because a second detention of a person by a police officer is "inherently more intrusive and coercive than the first," Ilazi, 730 F.2d at 1126, I would hold that the trial judge erred in refusing to suppress the evidence, and I would reverse Jackson's conviction for possession of cocaine with intent to distribute.