BENTON, Judge,
dissenting.
When Officer Bandy first detained Leonard Shelton Jackson, he discovered no evidence to suggest that Jackson might have been involved in the discharge of a weapon. Because Officer Bandy did not obtain evidence of criminal activity *357 either during or after the search, I would hold that the second detention violated Jackson’s fourth amendment right to be free from “ ‘unreasonable searches and seizures.’ ” Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968)(quoting Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960)).
[I]f probable cause is not developed during a Terry-type encounter, the officer must release the suspect. This is the case because when reasonable suspicion has been dispelled or probable cause has not developed, the conduct upon which the officer originally based his suspicions has proved to be an illusory ground for suspicion under the particular circumstances, and thus, has been exhausted. Being illusory, the ground no longer reasonably supports a continuation of the search. Absent a new and independent basis for suspicion, the officer must halt his investigation in accordance with Terry and [United States v.] Place [, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)].
Of course, a second officer who is unaware of the fruitless search conducted earlier may initiate his own investigation based on the same “suspicious” behavior that was exhausted by the first officer’s failed investigation. The officer who performed the original investigation, however, may not release the suspect as required by Terry and Place, wait until he has travelled down the road a few miles, and then make a second Terry stop based solely on the conduct that has already proved to be illusory. Similarly, the officer cannot circumvent Terry and Place by calling upon a different officer to make the second intrusion in his stead.
United States v. Peters, 10 F.3d 1517, 1522 (10th Cir.1993).
The evidence proved that after Officer Bandy heard several shots from a handgun he looked up a hill and saw seven or eight people standing around. He “saw [a] muzzle flash in the area.” Officer Bandy heard the radio dispatcher broadcast a report of gunfire, told the dispatcher he was in the area, and walked toward the assembled group. As he approached, he saw several individuals walk to an automobile, and he saw doors and the trunk opened and closed. Two to five minutes *358 passed before he reached the individuals. He concluded that they went to the automobile because “several subjects evidently saw [him] or something.” When Officer Bandy arrived at the automobile, he detained several persons and “started patting down a couple of the subjects [, including Jackson] for weapons.” Several individuals walked away, however, and were not detained or frisked.
When Officer Davis arrived in her vehicle, Officer Bandy told her what he had observed and done. Officer Bandy had not discovered a gun and did not arrest the individuals who he had detained and frisked. Officer Davis drove away. Although Officer Bandy walked away, he continued to watch Jackson and the remaining individuals. He did not see a gun or hear any more gunfire.
After Officer Bandy walked away, he saw four individuals return to the automobile. Three of the individuals entered the automobile and one remained outside. Officer Davis then returned and drove by the automobile. She saw the individuals leave the automobile, go to another vehicle across the street, and lean on it. Officer Davis again drove away.
When Officer Davis drove away, the individuals returned to the automobile and drove away. Officer Bandy contacted Officer Davis and asked her to stop the automobile. Officer Bandy testified that he asked Officer Davis to stop the automobile Jackson was driving because he suspected that a gun was in the automobile. No gun was found in the automobile during the search.
When viewed “objectively through the eyes of a reasonable police officer,” Murphy v. Commonwealth, 9 Va.App. 139, 144, 384 S.E.2d 125, 128 (1989), the circumstances that the officers observed after Officer Bandy detained and frisked Jackson did not amount to a reasonable suspicion that Jackson or anyone in the automobile possessed a gun. That three people entered the car and were capable of leaving the area by automobile and not by foot did not contribute to reasonable suspicion that they possessed a gun.
*359 Furthermore, when Officer Bandy first detained and searched Jackson, he knew that several individuals had quickly walked away and left the area. The officer did not eliminate the likely possibility that the persons who walked away had the gun. He knew, however, that Jackson and the persons he frisked near the automobile did not possess a gun.
The purpose of a Terry stop is to promptly dispel or confirm an officer’s suspicions. 392 U.S. at 30, 88 S.Ct. at 1884. Since “probable cause [was] not developed, the conduct upon which [Officer Bandy] originally based his suspicions ... under the particular circumstances, [was] exhausted.” Peters, 10 F.3d at 1522. Without a “new and independent basis for suspicion” Officer Bandy could not continue the detention. Id. When Officer Bandy told Officer Davis to stop the automobile, the officers conducted ah unlawful Terry stop.
The cases that have addressed the legality of successive detentions have generally held that government agents may not detain an individual a second time upon the same suspicions of criminal activity. In Peters, an Arizona police officer stopped a rental truck for erratic driving. 10 F.3d at 1519. After checking the driver’s and passenger’s identification and observing that they were extremely nervous, the officer concluded that they possessed drugs and asked for consent to search the truck. Failing to find any drugs during his search, the officer allowed the driver to leave and relayed his suspicions to a border patrol agent. The agent followed the truck and observed it make an abrupt lane change. When the agent looked at the occupants, he concluded that the driver and passenger were nervous and stopped them on suspicion of carrying illegal narcotics. Id. at 1519-20. The Court ruled that the second Terry stop was unlawful because there was no “new and independent basis” for a search. Id. at 1522.
United States v. Miranda-Garcia, 23 F.3d 1331 (8th Cir. 1994), involved similar circumstances. A police officer stopped a rental truck after he saw it swerving on the interstate. He issued the driver a warning ticket, inquired about weapons and narcotics, and conducted a brief search of the truck with *360 the occupant’s consent. After allowing the driver and passenger to leave, the officer learned that the passenger had been arrested on a firearms violation. The officer asked his dispatcher to send a drug-trained dog and requested another officer to stop the truck. Id, at 1333. Following a second search, the officer discovered cocaine in the truck’s cab. Id. at 1333-34.
The court held that the second detention violated the fourth amendment because the agent had no reasonable suspicion of criminal activity. Id. "at 1336. The officer saw a traffic violation and suspected criminal activity during the first detention; however, the only additional information to justify the second stop was the report of a previous firearm violation. That information did not suggest criminal activity was ongoing, and, therefore, the officer had no more reasonable suspicion during the second detention than the first. Id. at 1335-36.
Relying principally upon United States v. Ilazi, 730 F.2d 1120 (8th Cir.1984), and Jha v. Commonwealth, 18 Va.App. 349, 444 S.E.2d 258 (1994), the majority upholds the second detention in this case. Those cases do not support the majority’s conclusion. In Ilazi, the defendant did not contest the finding “that reasonable suspicion also justified the [second] stop ... but argue[d] instead that the second stop, occurring as it did soon after the initial stop ... constituted an arrest without probable cause.” Id., 730 F.2d at 1125. The police discovered during the first detention that the defendant was an alien carrying identification papers with two different names, that defendant was traveling with another alien who had no passport, and that defendant had no luggage. The Court ruled that the first detention “tended to confirm [the officers’] suspicions of illegal activity” and held that the second detention did not constitute an arrest without probable cause. Id. at 1126. That holding is not relevant to the issue in this case.
Although in Jha this Court upheld a second detention of a suspect within an hour of the first detention, the issue of successive Terry detentions was not raised. Moreover, during *361 the intervening hour, the police observed additional suspicious behavior that supported the second detention. The police first detained Jha when they were investigating a call about a suspicious person behind a store. The officer saw Jha outside the rear door of a store with his hand raised as if attempting to break into the store. After Jha ran, an officer detained him. During a search of Jha and his vehicle, the officer found a screwdriver-like device, a computer device, and a radio. After the officer released Jha, the officer discovered a telephone junction box open with wires exposed in the area behind the store where Jha had been. Id., 18 Va.App. at 350-51, 444 S.E.2d at 259.
Other officers who heard the report followed Jha. Jha drove away from the store and into a development. The officers following Jha noticed that a vehicle’s window had been smashed in the area where Jha had been. The officer then approached Jha to get identification and saw in plain view a device that was used to tap into telephone lines. This Court ruled that Jha “was detained only after the police found a van, with a broken window and glass lying on the seat, in the area in which [Jha] had just been walking.” Id. at 354, 444 S.E.2d at 260. This additional cause to believe Jha had committed another offense distinguishes the detention of Jha from that of Jackson.
The reasoning and analysis in United States v. Morin, 665 F.2d 765 (5th Cir.1982), is more pertinent to this case. A police officer suspected Morin might be smuggling drugs and detained him in the Dallas airport. After making inquiries, the officer released Morin and allowed him to board his airplane. The officer then notified officers in the Austin airport of his suspicions. Relying solely on the Dallas officer’s suspicions, officers in -Austin approached Morin and again detained him. Acknowledging “[t]he coercion inherent in the successive stop situation,” the court ruled that “successive stops of an individual based on the same information strongly indicate a finding that an arrest has taken place.” Id. at 769. The Court found that in the absence of probable cause the second stop amounted to an unlawful second fourth amend *362 ment seizure because both stops were based on the same information. Id.
The record reveals that Officer Bandy ordered the car stopped for the same reasons he conducted the first stop—a suspicion that someone may have possessed a gun. Applying the analysis in the foregoing cases, I would hold that Officers Davis and Bandy unlawfully conducted successive detentions based upon the same information. The second detention was not predicated upon any violation of law. The officers did not obtain any “new” information. They relied on “old” information and detained Jackson without a reasonable articulable suspicion of criminal activity. Because a second detention of a person by a police officer is “inherently more intrusive and coercive than the first,” Ilazi, 730 F.2d at 1126, I would hold that the trial judge erred in refusing to suppress the evidence, and I would reverse Jackson’s conviction for possession of cocaine with intent to distribute.