UNITED STATES of America, Appellee,

v.

Jose Luis GARCIA, Appellant.

UNITED STATES of America, Appellee,

v.

Viviano MIRANDA–GARCIA, Appellant.

Nos. 93–2195, 93–2634.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1993.

Decided May 4, 1994.

Peter Blakeslee, Lincoln, NE, argued (Daniele F. Boyle, Denver, CO, on the brief), for appellant.

Bruce Gillan, Lincoln, NE, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, BEAM, Circuit Judge and JACKSON,* District Judge.

BEAM, Circuit Judge.

Nebraska State Patrol Trooper Gerald Schenck found cocaine and other evidence of illegal drug commerce in a truck driven by Viviano Miranda–Garcia, in which Jose Luis Garcia was a passenger. Schenck's discovery was made during a search that occurred after Schenck stopped the truck for the second time as it travelled through Nebraska on I–80. Miranda–Garcia and Garcia (collectively "the appellants") were both charged with

---

* The Honorable CAROL E. JACKSON, United States District Judge for the Eastern District of Missouri, sitting by designation.

conspiracy to distribute and possession with the intent to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1). The district court adopted the magistrate judge's recommendation to deny the appellants' motions to suppress the cocaine and other evidence Schenck found in the truck. Thereafter, Miranda–Garcia entered a conditional plea of guilty and Garcia was convicted by a jury. This combined appeal requires us to determine whether Schenck had sufficient suspicions that criminal activity was afoot to justify stopping the truck driven by Miranda–Garcia under the Fourth Amendment. Because we find that the second stop violated the principles of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), we reverse.

## I. BACKGROUND

We summarize the relevant facts found by the magistrate judge and adopted by the district court: on March 17, 1992, as Trooper Schenck was travelling west on I–80 shortly before noon, he observed a U–Haul rental truck in front of him drive its right wheels onto the shoulder of the roadway three times, once as far as two and one-half feet off the travelled portion of the interstate. Suspecting that the driver of the truck might be impaired, Schenck stopped the vehicle and asked the driver for his license. The driver, Miranda–Garcia, handed Schenck a license which showed an El Paso, Texas, residence. Schenck talked to Miranda–Garcia about drinking and driving. Miranda–Garcia did not respond at first, but later denied any drinking. Miranda–Garcia also conversed with his passenger, Garcia, in a foreign language which Schenck assumed was Spanish. Upon determining that Miranda–Garcia did not appear to be impaired, Schenck issued him a warning ticket.

Schenck then asked if he could talk with the appellants for a minute. Miranda–Garcia nodded his head in agreement. In response to Schenck's inquiry, Miranda–Garcia stated that the truck contained furniture. Schenck asked "are you moving?" Miranda–Garcia responded "yes, moving to El Paso." At that point, Garcia corrected Miranda–Garcia, stating that they were not really moving, but

that they were taking furniture to El Paso. Schenck asked the appellants if they had any weapons or narcotics with them. Both denied having any, but Garcia volunteered, "would you like to look?" Schenck responded affirmatively. The appellants then exited the cab and went to the rear of the truck.

Schenck asked Garcia for identification. Garcia produced an alien identification card with the name Jose Garcia–Aviles showing a residence in Chihuahua, Mexico. Schenck asked Garcia for a key to the cargo department and Garcia in turn asked Miranda–Garcia. Miranda–Garcia unlocked the padlock on the back of the truck while Schenck called his dispatcher for a National Crime Information Center identification check on the names he had been given.

After Miranda–Garcia unlocked the truck, Garcia opened the door. Schenck observed that the cargo compartment—approximately eight feet wide, seven to eight feet high and twelve feet long—was fully loaded with furniture boxes tied together with light nylon ropes. He also noticed that there was no visible luggage or clothing. Schenck's dispatcher subsequently reported that there were no warrants pending on either of the individuals identified. Schenck then requested a check with the El Paso Intelligence Center (EPIC) and asked for backup to help him search the truck. According to the dispatcher's information on available officers, Schenck estimated it would take ten minutes for another officer to arrive. Although he had not yet received a response from EPIC, Schenck decided to let the appellants proceed on their way. Schenck estimated that the entire encounter lasted between seven and twelve minutes.

Shortly after Schenck permitted the truck to leave, he received a response from EPIC indicating that Jose Garcia had been arrested by the border patrol on a firearms violation. Thereupon, Schenck asked the dispatcher to send him assistance and a drug-trained dog, and requested that another trooper intercept the truck. Trooper Frank Bohac stopped the truck some thirty miles west of the original stop.

Bohac advised the appellants that the trooper who had stopped them earlier want-

**1334**

ed to talk with them further. Schenck arrived six or seven minutes later. Schenck asked the appellants if they remembered giving him permission to search the truck and if he still had their permission. Miranda-Garcia said yes and started unlocking the cargo compartment. Schenck left the appellants with two other troopers at the rear of the truck and went to search the cab. There he discovered a bulging plastic bag which contained a protruding square shaped package wrapped in duct tape. He thought that the package might contain a kilogram of cocaine or marijuana. Schenck also found a three-inch-thick package of twenty dollar bills in a duffle bag located on the floor of the cab. Schenck then went to the rear of the truck, ordered the appellants out of the cargo compartment and arrested them. He subsequently returned to the cab where he found another package wrapped in duct tape and four packages similar to the one that contained the money. Schenck cut into one of the packages and white powder came out.

## II. DISCUSSION

The appellants argue that both stops violated their rights under the Fourth Amendment because neither stop was supported by a reasonable suspicion under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We review the district court's findings of fact for clear error and review the ultimate conclusion of whether the Fourth Amendment has been violated de novo. *United States v. Hernandez,* 854 F.2d 295, 297 (8th Cir.1988).

■ Because the Fourth Amendment issue involved in the second stop is dispositive of the case, we need not delay long to consider the constitutionality of the first stop. We pause to note, however, that Schenck first stopped the truck after he observed it swerve from the roadway three times, a violation of Nebraska law. Stops for traffic violations more than surmount the *Terry* standard of reasonable suspicion. "When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." *United States v. Cummins,* 920 F.2d 498, 500 (8th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448

(1991). The appellants' primary challenge to the first stop is based on their contention that the truck did not actually swerve off of the roadway. Our review of the record has uncovered no clear error in the magistrate judge's credibility determinations or findings of fact regarding the traffic violation. Furthermore, the record does not support any contention that the scope of Schenck's inquiries exceeded the justification for the stop. *Cf. United States v. Ramos,* 20 F.3d 348, 351–352 (8th Cir.1994). We conclude, therefore, that the first stop fell well within permissible police conduct under the Fourth Amendment.

■ The second stop was not predicated on any violation of the traffic laws. It was a straightforward investigatory stop. *Terry* permits law enforcement officers to make such a limited seizure of individuals suspected of criminal activity if the officer has "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880; *see also United States v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 678, 83 L.Ed.2d 604 (1985) (*Terry* rationale extends to stop of automobiles premised on reasonable suspicion the occupants are violating the law). Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances. *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). To be reasonable, the suspicion must be more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883.

■ The district court enumerated the articulable facts that the state relies on to support the second stop:

(1) the driver and passenger were in a rented truck packed from bottom to top with furniture boxes; (2) despite the fact that one of the suspects told the officer they were moving to El Paso, Texas, the officer observed no luggage or clothing bags when he opened the truck during the first stop; (3) the driver's story about why

he was going to El Paso was slightly different than the passenger's story, with the driver stating they were "moving to El Paso" and the passenger stating they were moving furniture to El Paso; (4) the driver had an El Paso, Texas, driver's license and the passenger gave an identification card which indicated he was from Mexico; (5) there was no explanation of why a person with an El Paso driver's license and [a] person with a Mexican identification card would be in Nebraska on an east-west interstate highway either for the purpose of "moving to El Paso" or moving furniture to El Paso; (6) a check of the El Paso Information Center computer established that the passenger had been arrested by the border patrol for a firearms violation; (7) the driver and passenger at one point conversed in a foreign language which the officer assumed was Spanish; and (8) the officer knew that El Paso, Texas, is a source city regarding the entry of drugs into this country from Mexico.

*United States v. Garcia,* No. 4:CR92–3018, mem. op. at 4–5 (D.Neb. Nov. 2, 1992) (footnote omitted).

■ Although we are mindful that "conduct which would be wholly innocent to the untrained observer ... might acquire significance when viewed by an agent who is familiar with the practices of drug smugglers and the methods used to avoid detection," *United States v. Wallraff,* 705 F.2d 980, 988 (8th Cir.1983) (internal quotation omitted), we find it difficult to perceive the connection between driving a rented truck full of furniture in Nebraska and drug trafficking. Both times Schenck stopped the appellants, they were driving west on I–80, an interstate that connects the Nebraska Furniture Mart[1] (a large discount furniture retailer with a national clientele) in Omaha, Nebraska, with I–25, a four-lane interstate that proceeds south to their stated destination of El Paso, Texas. Although it may be unusual to run across people transporting furniture from Nebraska to Texas, it does not indicate any criminal motive. Furthermore, the fact that a source city for illegal drugs entering this country was on the appellants' itinerary would provide a more rational basis for suspicion that the appellants were transporting drugs through Nebraska if they had been travelling away from El Paso, rather than toward it.

■ We find Garcia's nationality and the appellants' use of Spanish similarly unavailing to support a reasonable suspicion of criminal activity in this case. Although nationality or race may be relevant factors in some instances, for example when they are used to establish identity, *see United States v. Collins,* 532 F.2d 79, 83 (8th Cir.), *cert. denied,* 429 U.S. 836, 97 S.Ct. 104, 50 L.Ed.2d 102 (1976), their relevance in this case is unclear. The state has produced no evidence that Mexican citizens are any more or less likely to transport illegal drugs than native born or naturalized citizens of the United States. The fact that Garcia was carrying a Mexican identification card does not implicate him in illegal activity. This fact does, however, offer an innocent explanation for the confusion over the distinction between moving and moving furniture. It also explains why Miranda–Garcia might speak to him in Spanish.

This case is somewhat peculiar because Schenck obtained most of the facts on which the state relies to support the second stop during the original traffic stop and aborted search of the appellants' truck.[2] The only fact which Schenck learned after he aborted his original search and before he stopped the appellants for a second time was that Garcia had a prior arrest on a firearms violation.

---

1. Indeed, the evidence at Jose Garcia's trial established, through the testimony of a store cashier, that Garcia had purchased $8,000 worth of furniture at the Nebraska Furniture Mart and that the store "guaranteed" the "lowest prices there is." Trial Transcript Vol. II at 249.

2. We have previously observed that although there is no *per se* prohibition against successive investigatory stops, the second stop is often "inherently more intrusive and coercive than the first." *United States v. Ilazi,* 730 F.2d 1120, 1126 (8th Cir.1984); *see also United States v. Peters,* 10 F.3d 1517, 1522–23 (10th Cir.1993) (requiring independent basis of suspicion for second *Terry* stop).

Even with this additional piece of information, we hold that all of the facts taken together did not create a reasonable, articulable suspicion that the appellants were engaged in illegal activity.

The evidence of drug commerce that the state obtained during the unconstitutional second stop of the appellants' rental truck was tainted by the unlawful seizure. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Millan,* 912 F.2d 1014, 1016 (8th Cir.1990); *United States v. Jefferson,* 906 F.2d 346, 348 (8th Cir.1990). We are not empowered to suspend constitutional guarantees so that the government can more effectively fight the war on drugs. *Florida v. Bostick,* 501 U.S. 429, ——, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991). As Justice Marshall noted, "it was one of the primary aims of the Fourth Amendment to protect citizens from the tyranny of being singled out for search and seizure without particularized suspicion *notwithstanding* the effectiveness of this method." *Id.* (Marshall, J., dissenting) (emphasis in original). Accordingly, the judgments of the district court denying appellants' motions to suppress and the appellants' convictions must be reversed.[3]

## III. CONCLUSION

For the reasons discussed above, we reverse the judgments of the district court and remand these cases for further proceedings in accordance with this opinion.

---

3. It is unnecessary for us to address the appellants' further contentions of error.