42 P.3d 706

STATE of Idaho, Plaintiff–Respondent,

v.

Michael BRUMFIELD, Defendant–Appellant.

No. 26388.

Court of Appeals of Idaho.

Dec. 18, 2001.

Review Denied March 27, 2002.

Molly J. Huskey, Interim State Appellate Public Defender; Richard J. Hansen, Deputy Appellate Public Defender, Boise, for appellant. Richard J. Hansen argued.

Hon. Alan G. Lance, Attorney General; T. Paul Krueger II, Deputy Attorney General, Boise, for respondent. T. Paul Krueger II argued.

LANSING, Judge.

Michael Brumfield appeals the district court's denial of his motion to suppress evidence found in the trunk of the car in which he was a passenger. Additionally, Brumfield argues that the district court abused its discretion by imposing an excessive sentence and denying his Idaho Criminal Rule 35 Motion for reduction of the sentence.

## I.

## BACKGROUND

On October 1, 1999, Lieutenant Mark Black of the Bannock County Sheriff's Department was "running radar" on Interstate 15 in his marked police vehicle. At approximately 2:00 p.m., Black observed a Nissan Altima without a front license plate pass by his position. Black pursued the car to determine if it was from a state that required only one license plate. After catching up to the car, which had slowed to 55 miles per hour in a 75 mile per hour zone, Black observed from the rear license plate that the car was from Arizona, a state which requires only one plate. Pulling alongside the car, Black observed that the driver of the vehicle was sitting up close to the steering wheel, while a passenger in the front seat was sitting low in the seat and puffing "excessively" on a cigar. Black called in a registration check on the vehicle. After Black had followed the car for several miles, dispatch informed Black that the car was not reported to be stolen but that the car's registration in Arizona had been suspended. On the basis of the registration suspension, Black initiated a stop of the vehicle at approximately 2:12 p.m.

When Black approached the automobile, he could smell a cigar odor. Black ordered the driver, Gilbert Houston, to exit the vehicle. Black questioned Houston about who owned the car, then patted him down for weapons, and asked if Houston was involved in "gang-

banging."[1] Black next explained the reason for the stop, asked for Houston's driver's license, and inquired about Houston's destination. Houston said that the car belonged to the passenger's brother. With respect to his destination, Houston first said he was headed to North Dakota, then abruptly changed his story to say that he was traveling to Montana to attend his uncle's funeral. After this conversation, Black called dispatch to request a driver's license and arrest warrant check on Houston and to summon back-up.

Next, Black ordered the passenger, Michael Brumfield, out of the vehicle. Black patted Brumfield down, inquired about "gang banging," and then explained the reason for the stop. Brumfield explained that the car's registration had been suspended for failure to show proof of insurance. He said that his brother, Tony Brumfield, who owned the car, was supposed to have obtained reinstatement of the registration by presenting proof of insurance to the Arizona Department of Motor Vehicles. Brumfield showed Black a current proof of insurance card in Tony Brumfield's name. Black then asked dispatch to verify with Arizona the reason for the suspension, but he received no additional information. When Black asked about Brumfield's travel destination, Brumfield said that he and Houston were traveling to Montana to attend the funeral of Brumfield's grandmother. Black requested a driver's license and warrant check on Brumfield. At approximately 2:21 p.m., dispatch responded to the earlier request about Houston, reporting that his license was valid and that there were no outstanding warrants for his arrest.

While waiting for dispatch to return the information on Brumfield, Black asked Brumfield if there were any drugs or weapons in the car. Brumfield replied that there were none. Black then asked both Brumfield and Houston for permission to search the car. Both refused, but when Black asked if he could search just the luggage located in the back seat, both consented. As Black began searching the luggage he discovered in the back seat a bag of cooked pork chops. Next, Black asked Brumfield what was in the trunk, and Brumfield replied that he "had no idea."

At approximately 2:26 p.m., Black told Brumfield and Houston that he suspected there were drugs in the car, and he called for a drug dog to a sniff their vehicle. Several minutes later, dispatch notified Black that Brumfield's driver's license was suspended but there were no active warrants for his arrest.

The drug canine handler, Deputy Young, came from a location thirty miles away and arrived at approximately 3:00 p.m. Young's drug dog alerted on the trunk of the vehicle. At that point, Brumfield and Houston were handcuffed for "officer safety and for investigative purposes." Using the car keys, Black opened the trunk and found six large packages of marijuana. Brumfield and Houston were arrested. The next day, Brumfield admitted to Black that he had known about the marijuana in the trunk.

Brumfield was charged with trafficking in marijuana, Idaho Code § 37–2732B(a)(1)(C), and filed a motion to suppress evidence resulting from the vehicle stop. The district court denied the motion. Thereafter, Brumfield entered a conditional guilty plea pursuant to I.C.R. 11(a)(2), reserving his right to appeal the district court's order denying his suppression motion. Brumfield was sentenced to a unified prison term of fifteen years with eight years determinate.

## II.

## ANALYSIS

### A. Suppression Motion

Brumfield asserts that the marijuana found in the vehicle's trunk should have been suppressed because it was the product of a detention that was unlawfully prolonged.

A traffic stop by an officer constitutes a seizure of the vehicle's occupants and implicates the Fourth Amendment's prohibi-

---

1. "Gang banging" is a slang term used to describe illegal street gang activity such as drug trafficking and the accompanying violence.

tion against unreasonable searches and seizures. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660, 667 (1979); *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct.App.1996). An investigative stop must be justified by a reasonable suspicion, derived from specific articulable facts, that the detained person has committed or is about to commit a crime. *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 237 (1983); *State v. Fry*, 122 Idaho 100, 103, 831 P.2d 942, 945 (Ct.App.1991).

■ Brumfield acknowledges that the initial vehicle stop was justified by probable cause to believe there was a violation of Idaho's vehicle registration statute, I.C. § 49–456(1), but he contends that the stop was transformed into an illegal detention for a drug investigation. Brumfield argues that there was no justification for Lieutenant Black's lengthening the detention beyond the period necessary for issuance of a citation for the registration violation. Consequently, he contends, the search of the trunk occurred during an unlawful detention and the marijuana must be suppressed. Because Brumfield does not challenge the district court's factual findings, but contests only the court's legal conclusions, the issue presented is one of law, which we independently review. *State v. Morris*, 131 Idaho 562, 565, 961 P.2d 653, 656 (Ct.App.1998); *State v. McIntee*, 124 Idaho 803, 804, 864 P.2d 641, 642 (Ct.App. 1993); *State v. Heinen*, 114 Idaho 656, 658, 759 P.2d 947, 949 (Ct.App.1988).

■ We disagree with Brumfield's position, for while Lieutenant Black was still investigating the vehicle registration matter, he gained information giving rise to reasonable suspicion of unrelated criminal activity. Although an investigative detention must ordinarily last no longer than is necessary to effectuate the purpose of the stop, *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325, 75 L.Ed.2d at 238, a detention initiated for one investigative purpose may disclose suspicious circumstances that justify expanding the investigation to other possible crimes. Thus, in *State v. Pabillore*, 133 Idaho 650, 654, 991 P.2d 375, 379 (Ct.App.1999), we held that a vehicle stop initiated for investigation of a car theft

was legitimately expanded to encompass possible drug-related offenses because, in patting down one of the vehicle occupants, officers found drug paraphernalia. *See also State v. Parkinson*, 135 Idaho 357, 362, 17 P.3d 301, 306 (Ct.App.2000) ("[A]ny routine traffic stop might turn up suspicious circumstances, which could justify an officer asking questions unrelated to the stop."); *State v. Myers*, 118 Idaho 608, 613, 798 P.2d 453, 458 (Ct.App.1990) (same).

■ In the present case, even before Lieutenant Black effectuated the stop, he had observed circumstances that contributed toward development of reasonable suspicion of drug activity, for he saw Brumfield slouched low in the front seat puffing "excessively" on a cigar while the driver was hunched forward toward the steering wheel in what may have been an effort to conceal Brumfield's activity from the officer's view. The officer knew from training and experience that cigar smoke was sometimes used to mask the odor of drugs. Then, while investigating the vehicle registration matter, Black observed a more suspicious circumstance: the inability of Brumfield and Houston to agree on the purpose of their trip. Houston initially told Black that he was driving to North Dakota, but then changed the destination to say he was going to Montana to attend the funeral of *Houston's uncle*. Brumfield, on the other hand, claimed to be going to Montana for the funeral of *Brumfield's grandmother*. It is difficult to envision an explanation, other than an effort at officer deception, for such divergent responses from co-travelers. Subsequently, while performing a consensual search of luggage and waiting for dispatch to respond to a driver's license and warrant inquiry on Brumfield, Black discovered a bag of cooked pork chops in the vehicle's back seat. This discovery also aroused Black's suspicion because he knew that persons transporting drugs sometimes use food to attempt to distract drug dogs. It was only after this discovery, and after also hearing Brumfield's claim that he "had no idea" what was in the trunk of a vehicle he had reportedly been traveling in for three days, that Black called for a drug dog.

All of these events occurred before Black received a report from dispatch on the status of Brumfield's driver's license and warrants. Therefore, at the point when Black called for a drug dog, the detention had not been temporally prolonged beyond the period reasonably necessary to investigate Houston's and Brumfield's use of an unregistered vehicle that neither of them owned.

In our view, continuation of the detention beyond that point was justified by reasonable suspicion that the vehicle contained drugs. Factors then known to Lieutenant Black which contributed to this reasonable suspicion included the following: (1) while the officer was driving alongside the car, Brumfield was sitting low in the passenger seat puffing excessively on a cigar while the driver assumed a position that could have been intended to block the officer's view of the passenger; (2) after the stop, Black noticed a very strong cigar odor coming from the car; (3) Houston and Brumfield gave inconsistent stories about the purpose of their trip, and Houston also amended his story about the state of destination; (4) Black discovered a bag of cooked pork chops in the back seat which might have been intended to distract a drug dog; and (5) Brumfield claimed not to know what was in the trunk, despite having traveled in the car for three days. Courts in other jurisdictions have held that strong odors in vehicles will contribute to reasonable suspicion of the presence of drugs. *See State v. Briggs*, 140 N.C.App. 484, 536 S.E.2d 858, 863 (2000) (burnt cigar odor); *United States v. Hernandez–Rodriguez*, 57 F.3d 895, 898 (10th Cir. 1995) (strong smell of perfume). Inconsistency in vehicle occupants' stories has also been held to support reasonable suspicion of criminal activity. *See, e.g., United States v. Hardy*, 855 F.2d 753, 758 (11th Cir.1988) (after their vehicle was stopped for speeding, driver's and passenger's inconsistent stories supported a finding of reasonable suspicion). Although many of the circumstances that aroused Lieutenant Black's suspicion are susceptible to innocent explanation, "a series of acts that appear innocent, when viewed separately, may warrant further investigation when viewed together." *United States v. Weaver*, 966 F.2d 391, 394 (8th Cir.1992). *See also United States v. Sokolow*, 490 U.S. 1, 9–10, 109 S.Ct. 1581, 1586–1587, 104 L.Ed.2d 1, 11–12 (1989); *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968).

Both Black and the officer who responded with the dog pursued their investigation diligently and with reasonable speed. It was only sixteen minutes into the stop when Black called for a drug canine unit. The responding deputy and dog arrived as quickly as possible, coming a thirty-mile distance in just over thirty minutes. Brumfield was detained for, at most, forty-nine minutes before the drug dog arrived. Detentions of fifty minutes or more while awaiting drug dogs have been upheld as reasonable in other jurisdictions. *See United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir.1994) (en banc) (one hour); *United States v. Frost*, 999 F.2d 737, 741–42 (3rd Cir.1993) (almost one hour); *Hardy*, 855 F.2d at 761 (fifty minutes).

Accordingly, we hold that the roadside detention of Brumfield was lawful. Although the vehicular stop began as one to investigate the operation of an unregistered automobile, information quickly developed which justified expansion of the detention to investigate a possible drug offense. Once the drug dog alerted on the vehicle, the officers possessed probable cause to conduct a warrantless search of the truck. *See State v. Gallegos*, 120 Idaho 894, 898, 821 P.2d 949, 953 (1991).[2] Therefore, Brumfield's motion to suppress evidence found in the trunk was properly denied.

## B. Sentence

Next, Brumfield argues that the district court abused its discretion by imposing an excessive sentence. When a sentence is challenged on appeal, we examine the record, focusing upon the nature of the offense and the character of the offender, to determine if there has been an abuse of the sen-

---

**2.** The use of the drug dog to sniff the exterior of the vehicle was not a search implicating Fourth Amendment rights. *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

tencing court's discretion. *State v. Young,* 119 Idaho 510, 808 P.2d 429 (Ct.App.1991). The defendant bears the burden to show that the sentence is unreasonably harsh in light of the primary objective of protecting society and the related goals of deterrence, rehabilitation and retribution. *State v. Toohill,* 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App. 1982). For purposes of appellate review, we consider the minimum period of confinement to be the probable duration of incarceration. *State v. Sanchez,* 115 Idaho 776, 777, 769 P.2d 1148, 1149 (Ct.App.1989). An abuse of discretion will be found only if, in light of the governing criteria, the sentence is excessive under any reasonable view of the facts. *State v. Charboneau,* 124 Idaho 497, 500, 861 P.2d 67, 70 (1993). Where reasonable minds might differ as to the length of the sentence, we will not substitute our view for that of the district court. *State v. Brown,* 121 Idaho 385, 393, 825 P.2d 482, 490 (1992); *State v. Admyers,* 122 Idaho 107, 108, 831 P.2d 949, 950 (Ct.App.1992).

■ Brumfield argues that his sentence is excessive in light of his remorse for the crime and his health problems. However, our independent review of the record confirms that the sentence imposed by the district court was not an abuse of discretion. Brumfield's conviction was for trafficking in more than 178 pounds of marijuana. Although he had admitted to police shortly after his arrest that he had been aware of the marijuana in the trunk, by the time of the presentence investigation and sentencing hearing, Brumfield asserted he knew nothing of the marijuana, and he took no responsibility for the offense. Brumfield had three prior felony convictions, including possession of marijuana with intent to distribute, carrying a concealed weapon, and possession of a prohibited weapon. Brumfield also had six misdemeanor convictions for such crimes as possession of drug paraphernalia, domestic violence, and weapons violations. Brumfield had not been employed since he was paroled from prison in 1996. Considering the seriousness of Brumfield's crime, his criminal history, and his unwillingness to accept responsibility for his actions, we cannot say that the district court abused its discretion in fashioning Brumfield's sentence.

■ Brumfield also argues that the district court abused its discretion by denying his motion for a reduction of the sentence. A motion to reduce an otherwise lawful sentence is essentially a plea for leniency, and a decision on such a motion is committed to the sound discretion of the sentencing court. *State v. Wersland,* 125 Idaho 499, 504, 873 P.2d 144, 149 (1994); *State v. Lavy,* 121 Idaho 842, 845, 828 P.2d 871, 874 (1992); *State v. Hernandez,* 121 Idaho 114, 117, 822 P.2d 1011, 1014 (Ct.App. 1991). If the original sentence was not excessive when imposed, the appellant must demonstrate that it is excessive in light of new or additional information presented with the motion to reduce. *Id.; State v. Springer,* 122 Idaho 544, 545, 835 P.2d 1355, 1356 (Ct. App.1992). Brumfield presented no new information with his Rule 35 motion and only asked that his sentence be reduced to be consistent with that imposed on his co-defendant. The district court denied the motion, noting that Brumfield's extensive criminal history was justification for a longer sentence. We perceive no abuse of discretion in this decision.

## III.

## CONCLUSION

The initial stop of the vehicle in which Brumfield was a passenger due to suspended vehicle registration was justifiably expanded by Lieutenant Black into a drug investigation, and the detention was not unduly or unnecessarily prolonged. Therefore, the district court correctly denied Brumfield's motion for suppression of evidence developed during the stop. Brumfield has shown no abuse of discretion in the sentence imposed or in the denial of his motion for reduction of the sentence. Accordingly, the judgment of conviction and sentence, and the order denying Brumfield's Rule 35 motion, are affirmed.

Judge Pro Tem MEEHL concurs.

Chief Judge SCHWARTZMAN, dissenting.

I respectfully dissent. As noted eloquently in *U.S. v. Bloomfield:* "The Fourth

Amendment is still part of the Constitution. The police cannot be allowed to engage, without reasonable suspicion, in intrusive practices likely to invade the privacy of a large number of innocent citizens in the name of drug interdiction." 40 F.3d 910, 924 (8th Cir.1994, McMillian, J., dissenting.) I would find that the fifty-minute-long detention was not based on reasonable and articulable suspicion, but instead was based entirely on Black's subjective instinct and hunch. As this court has noted on numerous occasions: "This reasonable suspicion standard requires less than probable cause, but more than speculation or instinct on the part of the officer." *State v. Naccarato,* 126 Idaho 10, 12, 878 P.2d 184, 186 (Ct.App.1994); *State v. Emory,* 119 Idaho 661, 664, 809 P.2d 522, 525 (Ct.App.1991).

The facts of this case should be amplified to give the reader a more realistic perspective of what happened on October 1, 1999, on Interstate 15 north of Pocatello. Black was on duty as the highest ranking officer with the Criminal Interdiction Unit of the Bannock County Sheriff's Department (CIU). At the suppression hearing, Sheriff Loren Nielson agreed that the CIU's primary function was "to discover [drug] trafficking and arrest and convict people [trafficking drugs]." This was to be achieved by using probable cause traffic violations to stop drivers on the roadways and then ask questions pertaining to other illegal activity. Officers of the CIU were expected to "get more people to voluntarily consent to searches of their vehicles."

Black testified that his attention was drawn to Brumfield's car because it was doing 77 mph in a 75 mph zone, had only one license plate, and the driver did not look at him. Based solely on the latter two facts, Black pursued the car. Black pulled alongside the car, which had slowed to 55 mph, and observed that the driver of the vehicle "appeared to be nervous" while the passenger in the front seat was "sitting low in the seat" and puffing "excessively" on a cigar. Several minutes later, when dispatch in-

formed Black that the car's registration had been suspended, he initiated a traffic stop.

Black ordered the driver, Houston, a young African American male dressed in gym clothes with his hair done in "cornrows," to exit the vehicle. Black asked several initial questions regarding the registration of the vehicle, but within two minutes patted Houston down for weapons and asked if Houston was involved in "gang-banging." Black then called dispatch to request a driver's license and warrant check on Houston and to summon backup.

Black told Houston to stand a distance down the road and then ordered the passenger, Brumfield, also a young African American male, to exit the vehicle. Again Black asked several initial questions about the car's registration and then patted Brumfield down, also inquiring about "gang banging." Black then asked a series of questions about who owned the car and the status of the registration, but at no time did he start filling out paperwork to issue a citation for lack of registration. Dispatch responded that Houston's license was valid and he had no outstanding warrants.

Black then asked Brumfield if there were any drugs or weapons in the car. When Brumfield said, "No," Black asked both Brumfield and Houston if he could search the trunk of the car. They refused, claiming they had borrowed the car from Brumfield's brother and didn't know what was in the trunk. They did consent to a search of their luggage located in the back seat. While searching the luggage, Black discovered cooked pork chops in a Ziploc bag. Finding no contraband in the passenger compartment, Black asked several more times for permission to search the trunk, but Brumfield steadfastly refused. At this time, approximately 2:26 p.m., Black announced that he believed there were drugs in the trunk and he was calling for a drug dog. Black then advised the parties that the vehicle "cannot be moved" as it was going to be impounded.[1] Black and his fellow officers

---

1. The car was stopped for violation of I.C. § 49–456(1), which states "It shall be unlawful for any person: To operate or for the owner to permit the operation upon a highway of any motor vehicle ... which is not registered...." Black testified that where a vehicle's registration is sus-

required Brumfield and Houston to stand at separate locations on the side of the Interstate for the next thirty minutes until Deputy Young and "Falco" arrived.

This court recently held in *State v. Parkinson*, 135 Idaho 357, 17 P.3d 301 (Ct.App. 2000), that it is not necessarily a Fourth Amendment violation for an officer who has stopped someone for a traffic violation to ask unrelated questions about drugs and weapons. *See also U.S. v. Shabazz*, 993 F.2d 431 (5th Cir.1993) (police officer's questioning on a subject unrelated to the purposes of the stop was not, in and of itself, a Fourth Amendment violation). The proper analysis under *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), is to focus on whether the police action increased the scope of the detention beyond a routine traffic stop. The scope of detention permissible in a given stop turns on the specific facts of the situation and the reasonable inferences officers may draw from those facts. *See, e.g., State v. DuValt*, 131 Idaho 550, 554, 961 P.2d 641, 645 (1998). Factors to consider are the duration of the stop and its intensity. *Id.*

Black's initial questioning about gang activity, drugs and weapons did not, in and of itself, improperly intensify the degree of the detention. However, once a reasonable time passed in which Black could have issued the traffic citation, the relevant question is whether Black had a reasonable suspicion, derived from specific articulable facts, that Brumfield had committed or was about to

commit a crime. *Royer*, 460 U.S. at 498, 103 S.Ct. at 1324, 75 L.Ed.2d at 237; *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581–2582, 45 L.Ed.2d 607, 618 (1975). The facts are to be judged against an objective standard: would the facts available to the officer at the moment of the seizure "warrant a man of reasonable caution in the belief" that the seizure was appropriate? *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968). Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, as is the case here.

Black testified that in light of his experience in drug interdiction, he observed enough suspicious behavior to give him the requisite reasonable articulable suspicion. Black catalogued the following behavior: 1) the car was going 77 mph in a 75 mph zone; 2) the driver did not look at Black when he passed; 3) when Black caught up to the car, the car slowed to 55 mph; 4) Houston looked nervous; 5) Brumfield was slouched low in his seat and puffing a cigar; 6) Houston and Brumfield gave inconsistent stories about the purpose of their trip; 7) Houston and Brumfield did not know what was in the trunk despite having driven the car for three days; and 8) the presence of the pork chops, coupled with the cigar smoke, which Black believed were attempts to mask the odor of illegal drugs.[2] These objective facts recount-

---

pended, the vehicle would either be impounded or removed to the side of the road until the owner of the vehicle corrected the problem through the Department of Motor Vehicles. Idaho Code § 49–236(2) states that "It is an infraction for any person to violate any of the provisions of [Chapter 4] of [Title 49] unless otherwise specifically provided." Idaho Code. § 49–456 does not provide that driving with an invalid registration is a misdemeanor; therefore under I.C. § 49–236 it is an infraction. Idaho Code § 18–113A states that: "Every offense declared to be an infraction is punishable *only* by a penalty not exceeding one hundred dollars ($100) and no imprisonment." (emphasis added). Additionally, I.C. § 49–662(3) gives authority to police officers to remove vehicles to the nearest garage or other place of safety in four circumstances not applicable to this case. Therefore, the only legal action available to Black when he stopped the car for a suspended registration was to issue a citation.

Moreover, Black's intent to "impound" the car is *belied* by his actions. If the car was truly to be impounded, there would be no need to call for "Falco, the drug dog." It takes no legal wizard to divine Black's *modus operandi*: if drugs are found, arrest and impound; no drugs under observation, give 'em a citation.

2. Conveniently absent from Black's matrix of suspicion was the fact that Houston and Brumfield were young, African American men, wearing clothes and hairstyles stereotypically associated with gang activity, driving an out-of-state car. Black testified, however, that officers of the CIU were strangers to the notion of "racial profiling":

Q: Has [the CIU] established any drug courier profiles?

Black: I'm not certain what you mean by profiles. Could you explain that to me?

Q: Okay. One thing that is popular in agencies around the country is the, at airports and

ed by Black—the speeding, the slowing down, the nervousness, the cigar smoking, the pork chops, the inconsistent stories—are readily susceptible to myriad innocent explanations. *See, e.g., United States v. Garcia,* 23 F.3d 1331, 1334–35 (8th Cir.1994) (holding that the factors cited by a state trooper as the basis for reasonable suspicion were insufficient in part because many of the factors were susceptible to an innocent explanation.) Although I am mindful that "conduct which would be wholly innocent to the untrained observer ... might acquire significance when viewed by an agent who is familiar with the practices of drug smugglers and the methods used to avoid detection," *United States v. Wallraff,* 705 F.2d 980, 988 (8th Cir.1983), I find it difficult to perceive the connection between nervousness, slowing down while being tailed for over ten minutes by a marked police cruiser, puffing on a cigar, bad posture and having a leftover pork chop in a Ziploc bag; and the crime of drug trafficking. In isolation and in the aggregate, each of these behaviors is perfectly innocent and legal. To hold that reasonable suspicion arises from these behaviors will call under suspicion a large group of innocent motorists. As stated in *Bloomfield,* "[w]hen examining a search and seizure question ... courts must be Argus-eyed[3] in the protection of innocent activity from unreasonable intrusion." 40 F.3d. at 924.

I find the police action in this case troubling and transparent. Black's attention was drawn to an out-of-state car driven by two young African American men. Based on a hunch, which may have been consciously or unconsciously driven by racial drug courier profiling, he decided to stop the car and follow the directive of the CIU to obtain consent for a vehicle search. Once the stop began, Black moved quickly to this purpose, abandoning any investigation of the purported reason for the stop. It is clear that Black had no intention of impounding the car over the registration issue. And when Brumfield refused consent to search the trunk, as he had *every right* to do, Black penalized him by detaining him for thirty additional minutes. While it is true that *in this instance* Black's hunch was correct and a large quantity of marijuana was discovered, our Fourth Amendment jurisprudence should not be outcome driven.[4] It is beyond cavil that the proliferation of drugs is a scourge on our society, but as noted in *Garcia:* "[The courts] are not empowered to suspend constitutional guarantees so that the government can more effectively fight the war on drugs." 23 F.3d at 1336. Black, as the highest ranking officer of the CIU, has other constitutionally acceptable options available to him. If he wishes to continue this type of activity—stopping cars for traffic violations and quickly running a drug dog around them—he is free to do so. It is now well settled that use of a drug dog to sniff the exterior of a vehicle is not a search. *U.S. v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–2645, 77 L.Ed.2d 110, 121 (1983); *see also Parkinson,* 135 Idaho 357, 17 P.3d 301. It is equally well settled that once a drug canine alerts on a car, the police have probable cause to conduct a warrantless search of the vehicle. *State v. Gallegos,* 120 Idaho 894, 821 P.2d 949 (1991). If Black wants to conduct this sort of

---

various places is to establish profiles of individuals they believe that may be involved in trafficking drugs. Do you have any written guidelines through the CIU or Bannock County's Sheriff's Office with regard to that?

A: I still don't understand the question.

Q: Do you have any guidelines on the types of people, the way they dress or whatever that would lead you to perhaps suspect that there may be criminal involvement with drugs with those people?

A: No, we do not.

*See and compare State v. Zavala,* 134 Idaho 532, 537–40, 5 P.3d 993, 998–1001 (Schwartzman, J. dissenting.)

3. Argus was a creature in Greek mythology with a hundred eyes, appointed by the gods to be a watchperson because he had the ability to keep at least one eye open at all times.

4. As I noted in *Zavala,* 134 Idaho at 538–39, 5 P.3d at 999–1000:

I have often wondered, both as a trial judge for over twenty-six years and as an appellate judge, just how many times this type of police scenario is replayed and no drugs are ever found. Of course, we shall *never know,* because the driver is merely allowed to go on his way, relieved that this mini-ordeal is now over without further inconvenience, and not particularly concerned that his constitutional rights have been subtly violated.

law enforcement activity, he simply needs to have "Falco" or "Gunnar" or any other drug-sniffing quadruped riding in the police car with him at all times.

In conclusion, I simply cannot support the continued detention of these two individuals for over thirty minutes awaiting the arrival of a drug dog, based solely on the instinctual hunches and speculation of law enforcement as detailed above. This case should be treated no differently than did the Idaho Supreme Court in *State v. Lira–Lara*, 132 Idaho 465, 974 P.2d 1094 (1999) (subsequent detention and delay of forty-five minutes to obtain consent to search vehicle and await presence of drug dog held to be unreasonably long and unconstitutional). Accordingly, I would overturn the trial court's order denying the motion to suppress.