**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 39183**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2012 Unpublished Opinion No. 776 |
| | ) | |
| Plaintiff-Appellant, | ) | Filed: December 28, 2012 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| TERRY R. SMITH, | ) | THIS IS AN UNPUBLISHED |
| | ) | OPINION AND SHALL NOT |
| Defendant-Respondent. | ) | BE CITED AS AUTHORITY |
| | ) | |

Appeal from the District Court of the Sixth Judicial District, State of Idaho, Caribou County. Hon. Mitchell W. Brown, District Judge.

Order granting motion to suppress evidence, reversed.

Hon. Lawrence G. Wasden, Attorney General; Mark W. Olson, Deputy Attorney General, Boise, for appellant.

Sara B. Thomas, State Appellate Public Defender; Sarah E. Tompkins, Deputy Appellate Public Defender, Boise, for respondent.

_____

MELANSON, Judge

The State of Idaho appeals from the district court's order granting Terry R. Smith's motion to suppress evidence. For the reasons set forth below, we reverse.

**I.**

**FACTS AND PROCEDURE**

An officer stopped Smith's vehicle for speeding. The officer approached the passenger side of Smith's vehicle and knocked. Smith rolled his window down six to seven inches. The officer requested that Smith roll his window all the way down, and Smith complied. The officer informed Smith of the reason for the stop and instructed Smith to present his driver's license, vehicle registration, and proof of insurance. While Smith was in the process of retrieving the requested documents, the officer observed multiple maps in the glove compartment and center console of the vehicle. The officer inquired about Smith's travels. Smith responded that he had been on vacation. Upon questioning about where Smith had been vacationing, Smith hesitated

1

for approximately two seconds, looked to the floor, and responded that he had been visiting friends in Utah and Nevada. During the course of this conversation, the officer noticed that Smith's vehicle had a lived-in appearance and that there did not appear to be sufficient luggage for Smith to be on vacation. This portion of the stop lasted between five to seven minutes. The officer returned to his patrol vehicle and ran two records checks incident to the traffic stop. The first check, which took approximately one minute, was on Smith's Colorado license to determine whether Smith had any outstanding warrants or whether his license was suspended. The officer was able to conduct this check on his in-car computer. The check revealed that Smith did not have any outstanding warrants and that his Colorado license was valid. The second check was a nationwide check that had to be called into dispatch and took approximately five minutes. While the officer ran these checks, he requested the assistance of a backup officer because he believed, at that point, he had reasonable suspicion to believe Smith was involved in criminal activity.

While waiting for the results of the nationwide check from dispatch, the officer returned to Smith's vehicle and asked Smith to exit. Smith complied. The officer conducted a pat-down search for weapons and again asked Smith about his travels. The officer determined that Smith was being evasive in his answers and was not maintaining eye contact. The officer also observed that Smith's eyes were glassy and glazed-over, which he believed to be a common indicator of marijuana use. Based upon this observation, the officer's knowledge that Colorado allows possession of marijuana for medical purposes and that Smith's license and registration were from Colorado, the officer asked Smith whether he used medical marijuana. Smith admitted that he had a medical marijuana card, denied smoking marijuana, but acknowledged that he ingested it with food. The officer requested Smith's consent to search his vehicle. Upon Smith's refusal, the officer had Smith stand with a backup officer while he returned to his patrol vehicle to retrieve his drug detection dog to conduct a drug sniff. As the officer was returning to his patrol vehicle, the results of the nationwide check came back from dispatch. The officer then deployed the drug dog, which immediately alerted to the odor of marijuana in Smith's vehicle. Based upon the alert, the officer conducted a search of Smith's vehicle, which revealed eight pounds of marijuana. The time that elapsed between the initial stop of Smith's vehicle and his arrest was approximately fifteen minutes.

The state charged Smith with trafficking in marijuana, I.C. § 37-2732B(1)(B). Smith filed a motion to suppress the evidence found in his vehicle, asserting that the officer unlawfully

extended the traffic stop beyond its original purpose. The district court granted Smith's motion. The state appeals.

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

## III.

## ANALYSIS

The state argues that the district court erred by granting Smith's motion to suppress. In the order granting Smith's motion to suppress, the district court recognized that Smith did not challenge the basis for the traffic stop of his vehicle and focused its inquiry on Smith's claim that the officer unlawfully extended the traffic stop beyond its original purpose. The district court stated:

> The Court believes the focal point of this inquiry lies within what the Court will refer to as the "first portion of the stop." For purposes of this analysis, "the first portion of the stop" includes everything up until the point when [the officer] observed what he referred to as Smith's "glassy" and "glazed over" eyes. At that point in time, in this Court's view, coupled with the instruction of the case law set forth above, there is little doubt that [the officer] had reasonable suspicion of criminal activity, marijuana or other illegal substances being used while Smith was operating a motor vehicle. From that point forward, the Court is convinced that [the officer's] conduct was rooted in facts that would support articulable suspicion of criminal activity sufficient to render his subsequent conduct both reasonable and constitutionally permissible.
>
> However, this Court's concerns and inquiry will focus on "the first portion of the stop." To properly analyze this issue, the Court feels that a time line is warranted. [The officer] testified that the initial stop, approach and interrogation took between five (5) to seven (7) minutes. His oral testimony at the evidentiary hearing on the Motion to Dismiss was more definitive that it was closer to five (5) minutes than seven (7) minutes. He also states that upon returning to his car he called for assistance and performed his warrant check. He indicated that this

check, which is conducted on his patrol car's computer, takes one (1) minute. [The officer] next noted that he routinely conducts a nationwide search which he must call in and request the assistance of dispatch. This nationwide check takes approximately five (5) minutes. [The officer] further testified that although he never wrote or issued a ticket, that process takes three (3) to five (5) minutes. Finally, [the officer] testified that a routine traffic stop takes approximately fifteen (15) minutes. He further testified that the time that elapsed between the initial stop and Smith's arrest was "almost exactly fifteen (15) minutes."

However, this stop did not conform with [the officer's] routine. At some point it morphed from a routine traffic stop into an investigative stop. In fact, [the officer] notes this fact when he testified that upon completing his initial interview of Smith at the passenger window of Smith's vehicle he requested assistance. He states as follows:

> At this point, based on my training and experience, I had reasonable suspicion to believe that criminal activity was afoot and I was going to inquire further.

Therefore, based upon [the officer's] testimony one event or a series of events transformed this stop from a routine traffic stop to one where [the officer] believed he had "reasonable suspicion" to broaden the scope of the stop and detain Smith for reasons different than the initial stop. As such, it is this period of time which the Court must analyze in determining whether or not Smith's Fourth Amendment Rights have been infringed upon.

(footnote omitted.) Accordingly, the district court limited its analysis to the knowledge that the officer "possessed about Smith when he called for assistance because in his mind he now possessed 'reasonable suspicion' and intended to broaden the scope of the stop and detention from a routine traffic stop into an investigation regarding illicit drug use or activity." This knowledge included that: (1) when the officer first approached Smith's vehicle, Smith rolled his window down six or seven inches; (2) upon asking Smith to produce his license and registration, the officer noticed several maps in the glove compartment and center console; (3) upon inquiring about Smith's travels, the officer observed a two second pause and Smith looked to the floor of his vehicle before responding; and (4) the officer observed the interior of Smith's vehicle had a lived-in appearance and Smith had insufficient luggage for traveling purposes. The district court purposely did not consider the knowledge gained by the officer once he reapproached Smith's vehicle while the nationwide check was running--that Smith had glassy and glazed-over eyes and admitted to ingesting medical marijuana. The district court concluded that, based upon the facts known to the officer before he returned to Smith's vehicle, it could not agree with the officer that there was reasonable articulable suspicion of criminal activity.

4

The district court also concluded that the officer did not abridge Smith's Fourth Amendment right against unreasonable seizure by conducting an informal interview of Smith incident to the traffic stop during the first portion of the stop. Rather, the district court emphasized that its concern was similar to that expressed in *State v. Aguirre*, 141 Idaho 560, 112 P.3d 848 (Ct. App. 2005). In *Aguirre*, while assisting other officers in a traffic stop, an officer noticed a vehicle circling the scene. The officer recognized the vehicle from prior contacts and knew its driver was a convicted felon with a history of firearm use. The officer observed the vehicle leave a nearby parking lot without coming to a complete stop. The officer decided to issue a citation for this traffic infraction, but trailed Aguirre for four to five miles while he called for backup and checked for outstanding warrants and other pertinent information before initiating a stop of Aguirre's vehicle. After two other officers arrived, Aguirre's vehicle was stopped. The officer asked Aguirre why he was circling the scene of the other stop; requested Aguirre's license, registration, and proof of insurance; asked if Aguirre possessed anything illegal; and requested Aguirre's permission to search his vehicle. Aguirre provided the requested information, answered that he did not possess anything illegal, and refused to grant the officer permission to search his vehicle. At that time, the officer ran a drug dog around Aguirre's vehicle. The dog alerted on a rear wheel well, and a search of Aguirre's vehicle revealed a weapon. Aguirre was arrested for illegal possession of a firearm. On appeal from the denial of Aguirre's motion to suppress, this Court determined that, after Aguirre had been stopped, there was no effort made to issue a traffic citation or dispel any concern as to why Aguirre had been circling the area of the unrelated traffic stop prior to the drug dog sniff. We noted that, because the deputy had contacted dispatch while trailing Aguirre and waiting for backup, he had already checked for outstanding warrants and other pertinent information prior to initiating the traffic stop. Accordingly, we held that the drug dog's sniff of Aguirre's vehicle unlawfully extended the scope of the traffic stop because the officers had abandoned the initial purpose of the stop. *Aguirre*, 141 Idaho at 564, 112 P.3d at 852.

The district court stated that its concern in this case was precisely the concern of this Court in *Aguirre*--that after the traffic stop was made, there was no effort made to further pursue the initial purpose of the stop. Specifically, the district court stated:

> It appears that [the instant stop] quickly transformed from a routine traffic stop to an investigative stop regarding illicit drug use or possession without the necessary accompanying reasonable and articulable suspicion of criminal activity. The

5

initial purpose of the stop was never pursued by [the officer]. His own testimony reveals that upon return to his patrol car he was pursuing one, and only one course of action, an investigation of Smith for illicit drug use or activity. The original purpose of the stop had been abandoned. This Court concludes that this change of direction, although premised upon good and proper instincts, was not founded upon reasonable and articulable suspicion and therefore, became constitutionally impermissible.

Accordingly, the district court concluded that the observation of Smith's glassy and glazed-over eyes and the dog sniff were the result of an unconstitutional expansion of the scope and duration of the traffic stop.

The state argues that the district court incorrectly applied a reasonable suspicion analysis based upon the officer's subjective beliefs. The state asserts that the officer's subjective belief as to the moment he obtained reasonable suspicion is not determinative of the question of when he actually extended the stop beyond its original purpose. The state also argues that, because the nationwide check was still running when the officer reapproached Smith's vehicle, when the officer observed that Smith had glassy and glazed-over eyes and admitted to ingesting medical marijuana, contrary to the district court's determination, the officer had not abandoned the original purpose of the traffic stop. Accordingly, the state asserts that, although the officer subjectively believed he had reasonable suspicion of Smith's drug activity after his initial contact with Smith, the officer did not actually extend the traffic stop beyond its original purpose until he deployed the drug dog, which did not occur until after the nationwide check was completed. The state argues that, based upon the totality of the circumstances that existed when the officer was awaiting the results of the nationwide check, there was reasonable articulable suspicion that would permit deployment of the drug dog to confirm or dispel that suspicion. The state concludes that the observation of Smith's glassy and glazed-over eyes and the dog sniff were not the result of an unconstitutional expansion of the scope and duration of traffic stop.

Where a person is detained, the scope of detention must be carefully tailored to its underlying justification. *State v. Roe*, 140 Idaho 176, 181, 90 P.3d 926, 931 (Ct. App. 2004); *State v. Parkinson*, 135 Idaho 357, 361, 17 P.3d 301, 305 (Ct. App. 2000). The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. *Roe,* 140 Idaho at 181, 90 P.3d at 931; *Parkinson*, 135 Idaho at 361, 17 P.3d at 305. Also, an investigative detention must be temporary and last no longer than necessary to effectuate the

6

purpose of the stop. *Roe,* 140 Idaho at 181, 90 P.3d at 931; *State v. Gutierrez,* 137 Idaho 647, 651, 51 P.3d 461, 465 (Ct. App. 2002). There is no rigid time limit for determining when a detention has lasted longer than necessary. *State v. Ramirez*, 145 Idaho 886, 889, 187 P.3d 1261, 1264 (Ct. App. 2008).

Brief inquiries not otherwise related to the initial purpose of the stop do not necessarily violate a detainee's Fourth Amendment rights. *Parkinson,* 135 Idaho at 362, 17 P.3d at 306. Any routine traffic stop might turn up suspicious circumstances that could justify an officer asking further questions unrelated to the stop. *State v. Brumfield*, 136 Idaho 913, 916, 42 P.3d 706, 709 (Ct. App. 2001). A routine traffic stop may be lawfully extended to deploy a drug detection dog where, during the stop, the officer acquires reasonable suspicion that the driver of the vehicle possesses drugs. *Id.* at 917, 42 P.3d at 710. However, the detention becomes unreasonable if an officer significantly extends the duration of the stop to investigate other criminal conduct for which there is no reasonable suspicion. *State v. Sheldon*, 139 Idaho 980, 984, 88 P.3d 1220, 1224 (Ct. App. 2003). Accordingly, the length and scope of the initial investigatory detention may be lawfully expanded if there exist objective and specific articulable facts that justify suspicion that the detained person is, has been, or is about to be engaged in criminal activity. *State v. Grantham*, 146 Idaho 490, 496, 198 P.3d 128, 134 (Ct. App. 2008). This reasonable suspicion standard is a less demanding standard than probable cause. *State v. Gallegos*, 120 Idaho 894, 896, 821 P.2d 949, 951 (1991). Whether the officer had the requisite reasonable suspicion to detain a citizen is determined on the basis of the totality of the circumstances. *State v. Van Dorne*, 139 Idaho 961, 964, 88 P.3d 780, 783 (Ct. App. 2004).

Here, as described above, the district court concluded that the officer abandoned the original purpose that justified the stop of Smith's vehicle sometime between the initial interview and the officer's return to Smith's vehicle because the officer testified that, at that point, he believed he had reasonable suspicion to believe Smith was engaged in criminal activity. Accordingly, the district court limited its analysis of whether there was reasonable suspicion to justify Smith's detention to circumstances known to the officer at that point. However, the test for reasonable and articulable suspicion is objective and does not depend on an officer's subjective thoughts. *Deen v. State*, 131 Idaho 435, 436, 958 P.2d 592, 593 (1998). Further, a police officer may briefly detain a driver to run a status check on the driver's license, after making a valid, lawful contact with the driver. *State v. Godwin*, 121 Idaho 491, 495, 826 P.2d

452, 456 (1992). Therefore, we conclude that the nationwide check was related to the purpose of the original stop of Smith's vehicle and, therefore, the officer did not abandon the purpose of the original stop until the results of the nationwide check were returned to him by dispatch.

The results of the nationwide check were not returned until after the officer reapproached Smith's vehicle, asked Smith to exit, observed that Smith had glassy and glazed-over eyes, asked Smith questions about medical marijuana, requested to search Smith's vehicle, and returned to his patrol car to retrieve his drug detection dog. While the nationwide check was running, it was not unlawful for the officer to ask Smith to exit his vehicle.[1] *See Parkinson*, 135 Idaho at 363, 17 P.3d at 307 (recognizing that it is within an officer's discretion to instruct the driver to exit the vehicle during a lawful stop). Upon Smith's exit, when the officer observed that Smith had glassy and glazed-over eyes, given the officer's knowledge that Colorado has medical marijuana and that Smith's license and registration were from Colorado, it was not unlawful for the officer to inquire of Smith whether he used medical marijuana or to request Smith's consent to search his vehicle. *See Grantham*, 146 Idaho at 496, 198 P.3d at 134 (recognizing that the officer's observations, general inquiries, and events succeeding the stop may give rise to legitimate reasons for particularized lines of inquiry and further investigation by an officer). Once the officer returned to his patrol vehicle to retrieve his drug detection dog and dispatch returned the results of the nationwide check, the officer abandoned the original purpose that justified the stop of Smith's vehicle by deploying his drug detection dog. However, given the totality of the circumstances that existed when the officer deployed the dog, there was reasonable articulable suspicion that Smith was engaged in criminal activity that permitted deployment of the dog to confirm or dispel that suspicion. Specifically, the officer had observed that Smith's eyes were glassy and glazed-over, Smith had admitted that he possessed a medical marijuana card and ingested marijuana, and Smith continued to be evasive in response to the officer's questions about his travels. Thus, we conclude that the district court incorrectly applied a reasonable suspicion analysis based upon the officer's subjective beliefs and erred by concluding that the

---

[1] The district court observed that normally the officer would write the traffic citation while the nationwide check was running. However, this observation is not based on facts in the record and the district court did not find that the officer was required to write a citation before the nationwide check completed the officer's investigation. Finally, the district court did not find that the nationwide check was, itself, an impermissible extension of the traffic stop or investigation.

observation of Smith's glassy and glazed-over eyes and the dog sniff were the result of an unconstitutional expansion of the traffic stop.

We also conclude that the district court's reliance on *Aguirre* is misplaced. Specifically, *Aguirre* is distinguishable from this case because, in *Aguirre*, the officer contacted dispatch and checked for outstanding warrants and other pertinent information while trailing Aguirre's vehicle and before initiating a traffic stop. Unlike *Aguirre*, the officer in this case conducted warrant and license checks after he stopped Smith's vehicle and did not receive the results of the nationwide check until just before he deployed the drug detection dog, a point by which the district court recognized the officer had reasonable suspicion to justify the deployment. Therefore, this case is more akin to *Brumfield*, 136 Idaho at 917, 42 P.3d at 710, where this Court held that officers did not unlawfully prolong a traffic stop to deploy a drug dog where the stop revealed reasonable suspicion of drug activity while the officers were awaiting reports from dispatch on the status of the suspect's driver's license and warrants.

Smith asserts three alternative grounds for suppression. Specifically, Smith asserts that the stop of his vehicle was unlawfully extended by the officer's questioning of Smith unrelated to speeding both prior to and following the officer's initial check of Smith's license and registration, the officer's running of the nationwide check after the first check revealed a valid Colorado license with no outstanding warrants, and the officer's pat-down search after Smith exited his vehicle.

As described above, prior to the officer's initial check of Smith's license and registration, the officer approached Smith's vehicle and asked Smith to present those documents. While Smith was in the process of retrieving them, the officer inquired about Smith's travels. Smith responded that he had been on vacation. Upon further questioning regarding where Smith had been vacationing, Smith hesitated for approximately two seconds, looked to the floor, and responded that he had been visiting friends in Utah and Nevada. Again, a reasonable investigation of a traffic stop may include asking the driver about his or her destination and purpose. *Parkinson*, 135 Idaho at 363, 17 P.3d at 307. Smith has not shown that, by asking such questions during the officer's initial encounter with Smith, which took between five and seven minutes, the officer unlawfully extended his detention. Specifically, the amount of time the officer actually spent inquiring about Smith's travels cannot be ascertained from the record because the five to seven minute period at issue included the officer's approach to Smith's

9

vehicle; his request for Smith to roll down his window and apprising Smith of the purpose of the stop; Smith's apology for speeding and claim he was not aware of the speed limit; the officer's request for Smith's license, registration, and proof of insurance; and Smith's collection and presentation of these documents. While Smith argues that the officer's questioning of Smith after the officer reapproached Smith's vehicle also unlawfully extended his detention, as explained above, when the officer observed that Smith had glassy and glazed-over eyes, given the officer's knowledge that Colorado has a medical marijuana law and that Smith's license and registration were from Colorado, it was not unlawful for the officer to inquire of Smith whether he used medical marijuana or to request Smith's consent to search his vehicle. *See Grantham*, 146 Idaho at 496, 198 P.3d at 134.

We next address Smith's arguments that his detention was unlawfully expanded by the officer's running of the nationwide check and by the officer's pat-down search. We first note that Smith raises these arguments for the first time on appeal.[2] Generally, issues not raised below may not be considered for the first time on appeal. *State v. Fodge*, 121 Idaho 192, 195, 824 P.2d 123, 126 (1992). Even addressing the arguments, while Smith contends that, once the officer ran the first check which revealed that Smith had a valid Colorado license and no warrants from Colorado, the officer had no reason to run a nationwide check, the officer testified that the two checks served different purposes. Specifically, the officer testified that the primary purpose of the initial check was officer safety to quickly reveal whether the stopped individual may be dangerous, while the nationwide check, which takes approximately five minutes, reveals whether a driver has a suspended license in any state. With respect to Smith's claim that his detention was unlawfully expanded by the officer's pat-down, we note that this search was done while the nationwide check was still running. Thus, the pat-down occurred prior to expansion of Smith's detention beyond the original purpose of the stop. Therefore, Smith has not shown that the district court erred by declining to conclude that the officer's pat-down unlawfully expanded the traffic stop of Smith's vehicle.

---

[2] Indeed, at the hearing on Smith's motion to suppress, Smith acknowledge the validity of the nationwide check and only argued that, once the officer received the results of the nationwide check from dispatch, the continued detention of Smith for purposes of deploying the drug dog was unlawful. Also, Smith never raised any argument related to the pat-down search.

10

**IV.**

**CONCLUSION**

The district court incorrectly applied a reasonable suspicion analysis based upon the officer's subjective beliefs and erred by concluding that the observation of Smith's glassy and glazed-over eyes and the dog sniff were the result of an unconstitutional expansion of the traffic stop. Therefore, the district court's order granting Smith's motion to suppress evidence is reversed.

Chief Judge GRATTON and Judge GUTIERREZ, **CONCUR.**